**Charles Street MILLS and Harry B. Williams, etc., Plaintiffs,**

v.

**The SARJEM CORPORATION, an Illinois Corporation, et al., Defendants.**

**Civ. A. No. 11840.**

United States District Court
D. New Jersey.
June 29, 1955.

Arthur W. Lewis, Camden, N. J., David Berger, Leon H. Kline, Philadelphia, Pa., for the motions of plaintiffs.

Pitney, Hardin & Ward, by Donald B. Kipp, Newark, N. J., contra and for the motion of defendants Chemical Bank & Trust Company and B. J. Van Ingen & Co., Inc.

Milton M. & Adrian M. Unger, by Milton M. Unger, Newark, N. J., contra and for the motion of defendants Sarjem Corp., Tuthill Ketcham, Richard C. Nongard and Rowland H. Murray, individually and trading as firm of Ketcham & Nongard, Robert M. Sherritt, Robert R. Greig, John E. Weinstock, William C. Mulligan, Clifford R. Powell, Paul A. Powell, Irene Powell, Mildred Powell Meader, Theodore R. Hanff, T. R. Hanff & Co., Inc., Thomas J. Christensen, Rickard W. Parks, Gladys Parks and Robert K. Bell.

Robert L. Hood, Newark, N. J., contra and for the motion of defendants Frank A. Snover, Tacony-Palmyra Bridge Co., and Burlington-Bristol Bridge Co.

Orlando, Devine & Tomlin, by Samuel P. Orlando, Camden, N. J., contra and for the motion of defendant Fitzgerald & Co.

Norcross & Farr, by Thomas M. Farr, Camden, N. J., contra and for the motion of defendants Buckley Securities Corp. and John A. Meyer.

FORMAN, Chief Judge.

This is a sequel to the financial saga of two toll bridges across the Delaware River, once owned by the Burlington-Bristol Bridge Company and the Tacony-Palmyra Bridge Company, as told by the New Jersey Supreme Court in the case of Driscoll v. Burlington-Bristol Bridge Co., 1952, 8 N.J. 433, 86 A.2d 201. The plaintiffs named in the complaint are Charles Street Mills[1] and Harry B. Williams, stockholders of the Tacony-Palmyra Bridge Company, the former having held 10 shares of Class "A" participating no par value stock and the latter 50 shares of that stock and 450 shares of common, no par value stock.

The defendants, for the most part, are the same characters portrayed in the New Jersey suit aforesaid consisting of: the Sarjem Corporation, an Illinois corporation, Tacony-Palmyra Bridge Company, a New Jersey corporation, Burlington-Bristol Bridge Company, a New Jersey corporation, Burlington County Bridge Commission,[2] a public body of Burlington County, New Jersey, Tuthill Ketcham, Richard C. Nongard and Rowland H. Murray, individually and trading as the firm of Ketcham & Nongard, a partnership, Robert M. Sherritt, Robert R. Greig, John E. Weinstock, William C. Mulligan, Clifford R. Powell, Irene Powell, Mildred Powell Meader, Robert

K. Bell, Theodore R. Hanff, T. R. Hanff & Co., Inc., a Pennsylvania corporation, Thomas J. Christensen, Rickard W. Parks, Gladys Parks, Fitzgerald & Co., B. J. Van Ingen & Co., Inc., a corporation, Buckley Securities Corporation, John A. Meyer, Frank A. Snover, and Chemical Bank and Trust Company.

This action is said to be brought not only for the plaintiffs above named but also on behalf of all other former stockholders of the Tacony-Palmyra Bridge Company similarly situated, based on the Securities Exchange Act of 1934, as amended, 15 U.S.C.A. § 78a et seq., including, without being limited to, Section 10(b) thereof, 15 U.S.C.A. § 78j (b) and Rule X–10B–5 promulgated thereunder; Section 15(c), 15 U.S.C.A. § 78o(c), and Rules X–15C 1–2, X–15c 1–5, and Section 78cc; and also under the Securities Act of 1933 as amended, 15 U.S.C.A. § 77a et seq., including, without being limited to, Section 5 thereof, 15 U.S.C.A. § 77e.

## I

In October of 1947 a syndicate consisting of Ketcham and Nongard, Thomas J. Christensen, Rickard W. Parks, Herbert K. Bell, Clifford R. Powell and Theodore R. Hanff, with an aggregate investment of $25,000, acquired the entire ownership of the Burlington-Bristol Bridge Company. Shortly thereafter Messrs. Ketcham and Nongard, Theodore Hanff and Clifford R. Powell took steps toward the acquisition of all of the stock of the Tacony-Palmyra Bridge Company to the end that the syndicate that had purchased the Burlington-Bristol Bridge Company would be able to transfer the stock of both companies to a bridge commission which would issue revenue bonds in a large amount assuring substantial returns to the syndicate members with little investment of funds upon their part. The interests of the members of

---

[1]. Since the commencement of the action this plaintiff, Charles Street Mills, died and his executors have applied to be substituted in his stead. The ruling on that application will be found in the course of this opinion.

[2]. Named as an additional defendant in the proposed amended complaint discussed herein.

the syndicate in the ultimate profits so to be realized were fixed at 25% each for Messrs. Hanff and Powell, 25% for the firm of Messrs. Ketcham and Nongard; and Messrs. Bell, Parks and Christensen were to divide the remaining 25%.

Some time in 1947 the group retained Mr. William C. Mulligan, a member of the firm of Winston, Strawn and Shaw, Chicago attorneys, as its chief counsel. Mr. Robert C. Sherritt and his Sarjem Corporation, a concern which specialized in gathering together outstanding shares in the hands of scattered stockholders, were engaged to solicit the stockholders of the Tacony-Palmyra Bridge Company, of which there were about 1500 scattered about the country, to agree to sell their shares. Meanwhile legislation had been passed by the New Jersey Legislature favorable to the plan by way of Chapter 318 of the New Jersey Laws of 1946, Chapter 401 of the New Jersey Laws of 1947 and Chapter 288 of the New Jersey Laws of 1948 so that no later than March, 1948, there was no doubt that the necessary bridge commission would come into existence when called for by Mr. Powell.

An attempt was made by Mr. Sherritt to deal with Mr. Leo Niessen, the president of the Tacony-Palmyra Bridge Company in 1947 for the stock of those in charge of its management. Nothing came of this then, and he turned to the Fidelity-Philadelphia Trust Company, which owned 2000 shares of the company and whose President, Mr. S. W. Cousley, was a director of the bridge company. In early 1948 he succeeded in interesting the Trust Company in the sale of its stock and negotiations were commenced by Mr. Sherritt with Messrs. Leo Niessen, Arthur Niessen, Grover C. Richman, Harry Sherman and Mr. Cousley, who were officers, directors and large stockholders of the bridge company, and known in this litigation as the Niessen group.

These negotiations culminated in the late summer of 1948 with a price agreed upon of $88.50 for the Class A and common shares and $154.87½ for the preferred stock. The book value of the preferred stock was $100 per share and for the Class A and common, $32.67 per share. The latter two were listed on the Philadelphia Exchange at 72 and 70 respectively, and the preferred was listed at 111. By September 7, 1948, the holders of 35% of the Class A and 60% of the common stock had signed agreements with Sarjem Corporation for the sale of their shares. On that date Sarjem Corporation mailed the letter and form of purchase agreement appended hereto as Annexes 1 and 2 to all the stockholders who had not already executed agreements. Just before this time, Sarjem Corporation engaged six other brokers and dealers including the defendant, Buckley Securities Corporation, to begin a campaign in several cities by personal interview, telephone, and mail to secure additional acceptances for which they were to receive $1 for each share of Class A and common stock and $1.75 for each share of preferred stock sold to Sarjem at their solicitation. A copy of the form of letter used by the defendant, Buckley Securities Corporation, is appended hereto as Annex 3.

By early October, 1948, the holders of more than 80% of the shares of each class of stock had signed agreements to sell to Sarjem Corporation. Among them were the plaintiffs, the late Mr. Mills and Mr. Williams. The form of sales agreement, Annex 2, contained provisions whereby each stockholder gave Sarjem Corporation the right to purchase his shares of stock at any time on or before November 1, 1948, but Sarjem Corporation was not required to take the stock unless prior to November 1, 1948, it had acquired similar purchase agreements from the holders of not less than 80% of each class of stock. Sarjem Corporation was authorized to designate individuals to vote the shares covered by the agreements at any stockholders' meeting which might be held after $6,487,500 had been deposited in escrow with the Continental Illinois National Bank and Trust Company, which sum represented all the money necessary for

the purchase or redemption of all the capital stock of the Tacony-Palmyra Bridge Company that was outstanding.

The circular letter, Annex 1, which accompanied Annex 2, among other things, advised each stockholder that the offer contained in the form was identical with that which had been accepted by "the holders of approximately 35% of the Class A stock and 60% of the common stock."

On October 6, 1948, Sarjem Corporation assured the management of the bridge company that it had agreements in hand in excess of 80% of the outstanding shares of stock and that it could perform all the other conditions surrounding its agreement to purchase the stock. After calling the preferred stock for redemption the directors of the bridge company resigned and Mr. Sherritt and other nominees of Sarjem Corporation were elected as officers and directors of the Tacony-Palmyra Bridge Company.

On October 11, 1948, the new directors gave notice of a meeting of the stockholders to be held October 22, 1948, to vote to recapitalize the Company by reclassifying Class A and common stock as preferred stock, redeemable at the purchase price named in the form of agreement, Annex 2, and by the issuance of a new class of common stock.

Incidental to the negotiations with the Niessen group in July of 1948, Sarjem Corporation agreed that certain sums should be paid out of the capital funds of the Tacony-Palmyra Bridge Company, including the following: $75,000 for repairs to the bridge, $25,000 in counsel fees to Mr. Richman and two other attorneys who represented the Company at that time and $33,000 as severance pay to employees of the Company of which $8,000 was to go to officers and directors of the Company. No disclosure of this arrangement was made by Sarjem Corporation or others soliciting the remaining stockholders to sign agreements for the sale of their shares.

Mr. William C. Laemmel, a Vice President of the Chemical Bank and Trust Company and other officers of the Bank were informed of the proposed transactions as early as February of 1948 by Mr. Ketcham who from time to time reported as to the progress that was being made toward the ultimate consummation of the project. Mr. Ketcham had introduced Mr. Sherritt to Mr. Laemmel and later he met Messrs. Nongard and Hanff as well as Mr. Powell.

Mr. B. J. Van Ingen, President and Mr. James G. Couffer, Vice President of B. J. Van Ingen & Co., Inc., as well as the officers of Chemical Bank and Trust Company were shown opinions, reports and surveys from experts in the fields of law and engineering concerning the value of the properties, the legality of various phases of the project designed to lodge the bridges in a governmental commission and on other matters.

By October 22, 1948, the date set for the stockholders meeting, better than 90% of the holders of each class of stock of the Tacony-Palmyra Bridge Company had executed agreements like Annex 2, and they had been forwarded to Sarjem. On that date all of the many steps to place the bridges in the ownership of a governmental commission were taken with speed. Sarjem had obligated itself to pay the stockholders of the Tacony-Palmyra Bridge Company the aggregate sum of $6,487,500. It agreed to sell it all to Burlington-Bristol Bridge Company for $6,700,000, of which Burlington was required to advance $6,487,500 by depositing it with the Continental Illinois Bank and Trust Company of Chicago in escrow in order to validate the proxies contained in the purchase agreements. Burlington borrowed this sum from Chemical. The reclassification of the stock of Tacony was effected by the vote of the proxies validated by the establishment of the escrow fund. There were 64,875 shares of the new common stock of Tacony and these were purchased by Sarjem for $6,487,500 which Sarjem had borrowed from Chemical, and Tacony immediately used these funds to redeem the outstanding preferred stock created in the classification. Sarjem delivered the 64,875 shares of new common stock of Tacony to

Burlington and its loan from Chemical for $6,487,500 was discharged with the funds released from the escrow deposit with the Continental Bank. The balance of the purchase price to be paid by Burlington of $212,500 was delivered by it to Sarjem.

Meanwhile as a result of Mr. Powell's efforts beginning on the evening of October 20th the Board of Freeholders of Burlington County conceived the Burlington County Bridge Commission by selecting its personnel, the members of which, in turn, on October 21, embryonically met to prepare themselves for the events of October 22. On the morning of that day the Commission was actually born when the Board of Freeholders of Burlington County in public meeting adopted a resolution creating the Burlington County Bridge Commission and naming their selections of the evening of October 20th as members. They were awaiting this action nearby and as soon as they were so informed they organized themselves, adopted by-laws, reports, and resolutions which had been prepared in advance for them and in less than an hour executed the vast number of documents pertaining to the transactions whereby bonds of their Commission in the sum of $12,400,000 would be issued. They immediately journeyed to the banking house of Chemical in New York where they went with the others through the intricate labyrinth of the final closing to bring title to the bridges into the Commission, described in great detail in the case of Driscoll v. Burlington Bristol Bridge Co., supra.

After the closing, B. J. Van Ingen & Co. organized a syndicate to dispose of the bonds consisting of 16 or 17 other brokerage firms, many of which were defendants in this suit but as to which the plaintiffs have suffered summary judgment.

As a result of the maze of transactions of the October 22 closing the Burlington County Bridge Commission obtained title to the two bridges and issued its revenue bonds in the sum of $12,400,000. These went into the hands of the Chemical Bank as security for loans made to the underwriting syndicate. Sarjem was left with $212,500, the difference between the price paid the stockholders of the Tacony-Palmyra Bridge Company and the selling price to the Burlington-Bristol Bridge Company. The original syndicate came away with a net of $1,894,637 after the payment of fees, expenses, discounts and a fund to cover possible tax liability.

## II

The gist of Counts 1 and 2 of the complaint as amended [3] is that prior to July 1, 1948, all of the defendants conspired to obtain ownership of the stock of the Tacony-Palmyra Bridge Company in violation of the provisions of the Securities and Exchange Act and the regulations above quoted and that the unlawful acts consisted in the main of the following:

(1) That a scheme was conceived whereby the defendant Sarjem Corporation should obtain transfer of the said stock at arbitrary prices fixed by the defendants, knowing that the stock would be transferred to the Burlington-Bristol Bridge Company, and thereafter ownership of the bridges of both companies would be placed in a Burlington County Bridge Commission and that the defendants thereby would reap large profits, all of which knowledge was concealed from the plaintiffs and the other stockholders of the Tacony-Palmyra Bridge Company in like situation.

(2) That the solicitation letter by the defendant Sarjem and the form of "offer", respectively Annex 1 and Annex 2,

---

3. At the time of oral argument on the motions for summary judgment on the original complaint, plaintiffs requested leave to file an amended complaint. Filing was deferred until subsequent to the argument, and all parties have had an opportunity to submit additional briefs pertaining to the amended complaint. Accordingly, the motions are here treated as directed to the amended complaint, which in most respects resembles, in grounds, the original complaint, except for the addition of the Burlington County Bridge Commission as a party defendant.

were devices employed in interstate commerce and the mails to defraud the plaintiffs and other stockholders, in that they failed to disclose the prearranged scheme in its entirety and the profits to be enjoyed by the defendants upon the consummation of the scheme.

(3) That the defendants caused further untrue statements of material facts to be made, or omitted to state material facts, in that Annex 1 purported to state that all of the stockholders were to receive equal compensation for their shares, when in fact certain stockholders comprising the Niessen group were favored by receiving a greater compensation for their shares than the remaining stockholders.

(4) That the letter of the Buckley Securities Corporation, Annex 3, constituted a similar device in that it appraised the price offered to stockholders for their shares as "fair and adequate" and that it was to the "distinct advantage of each holder" to accept the offer, when, in fact, the plaintiffs allege such advice was knowingly false.

(5) That the defendants, or some of them, caused articles to appear in editions of the New York Times and the Wall Street Journal of September 8, 1948, wherein it was erroneously reported that Annex 1 contained a statement to the effect that an escrow deposit of $6,487,500 had already been made.

(6) That no proxy statements were submitted to the plaintiffs or other stockholders in like situation in connection with the solicitation for the execution of Annex 2, nor was such a statement filed or registered with the Securities and Exchange Commission, nor were the proxies prepared in the form specified by Regulation 14 of the Securities and Exchange Commission.

In Count 1 the plaintiffs demand damages for themselves and other stockholders in like situation in the sum in excess of $3,459,000, representing all profits, fees and emoluments achieved by the defendants plus exemplary damages, costs, expenses and attorneys' fees, pursuant to the provisions of the Securities and Exchange Act of 1934 as amended.

In Count 2 they demand a decree effecting the rescission of the agreements and sales of stock by the plaintiffs and the class they seek to represent, with restitution of all profits pursuant to the provisions of the Securities Exchange Act of 1934 as amended, and if such rescission cannot be decreed because of intervening equities of bona fide purchasers for value of bonds, the plaintiffs seek a decree impressing an equitable lien upon the Tacony-Palmyra Bridge and revenues from the operation thereof from October 22, 1948.

In Count 3 they seek damages similar to those claimed in Count 1, based on the failure of defendants to register with the Securities and Exchange Commission solicitation letter, Annex 1, which they charge was in the nature of a certificate of deposit, in violation of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77a et seq.

In Count 4 they claim the same relief, rescission, etc., as in Count 2, alleging violation of the Securities Act of 1933, as aforesaid.

### III

Motions to dismiss the complaint and for summary judgments have been made by the defendants as follows:

(1) Chemical Bank & Trust Company and B. J. Van Ingen & Co., Inc.;

(2) The Sarjem Corporation, Tuthill Ketcham, Richard C. Nongard and Rowland H. Murray, individually and trading as the firm of Ketcham and Nongard, Robert M. Sherritt, Robert R. Greig, John E. Weinstock, William C. Mulligan, Clifford R. Powell, Paul A. Powell, Irene Powell, Mildred P. Meader, Theodore R. Hanff, T. R. Hanff & Co., Inc., Thomas J. Christensen, Rickard W. Parks, Gladys Parks, and Robert K. Bell;

(3) Buckley Securities Corporation and John A. Meyer;

(4) Fitzgerald and Company;

(5) Frank A. Snover, Tacony-Palmyra Bridge Company, Burlington-Bristol

Bridge Company, and Burlington County Bridge Commission.[4]

On behalf of the plaintiffs there have been the following motions:

(1) To substitute testamentary representatives for the plaintiff Charles Street Mills who died after the complaint was filed;

(2) To amend the complaint against certain defendants and to add the Burlington County Bridge Commission as an additional party defendant;

(3) For summary judgment against the defendants.

IV

One of the plaintiffs, Charles Street Mills, died on April 7, 1954. Subsequently, his executors, Mildred E. Gale and Howard Conover, moved to be substituted as plaintiffs pursuant to Rule 25(a), F.R.C.P. This motion is resisted by defendants Chemical Bank & Trust Co. and B. J. Van Ingen & Co. on the theory that the cause of action abated upon the death of the deceased Mills.

It is claimed that since the action is in tort it must abate upon the death of a party. The defendants submit that in Wogahn v. Stevens, 1940, 236 Wis. 122, 294 N.W. 503, 133 A.L.R. 1033, a suit involving the very legislation in this case, the cause of action was held to abate upon the death of the plaintiff. Since the tests of assignability and survivability are ordinarily the same, it is interesting to observe that all of the case authority appearing in the annotation to that case in the American Law Reports, 133 A.L.R. 1038–1040, is contra.

In the absence of statutory pronouncement in this regard the federal common law will be applied. Van Choate v. General Electric Co., D.C.Mass. 1917, 245 F. 120; Moore v. Backus, 7 Cir., 1935, 78 F.2d 571, 101 A.L.R. 379.

In a federal case concerned with damages as authorized under the anti-trust laws, the question, otherwise similar, was considered two years later by the Court of Appeals for the Fourth Circuit in Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir., 1942, 128 F.2d 645, 649, in which it said:

"The modern rule as to survivability, we think, is that actions for torts in the nature of personal wrongs, such as slander, libel, malicious prosecution, etc., die with the person, whereas, if the tort is one affecting property rights, the action survives. * *. * Underlying the distinction between actions that die with the person and those that survive is the basic thought that the reason for redressing purely personal wrongs ceases to exist either when the person injured cannot be benefited by a recovery or the person inflicting the injury cannot be punished, whereas, since the property or estate of the injured person passes to his personal representatives, a cause of action for injury done to these can achieve its purpose as well after the death of the owner as before. * * * 'The real test, so far as tort actions were concerned, seems to have been whether the injury on which the cause of action was based affected property rights, or affected the person alone. In the former case the cause of action survived, while in the latter it abated.' " Citing Sullivan v. Associated Billposters and Distributors, 2 Cir., 1925, 6 F.2d 1000, at page 1004, 42 A.L.R. 503.

It is further contended by these defendants that the action is penal in nature and as such cannot survive the death of a party thereto. However, 15 U.S. C.A. § 78bb clearly limits recovery under any section of the 1934 Securities Exchange Act to the actual damages sustained by a plaintiff. This relief appears to be remedial and actions for similar damages have been held to be assignable and capable of survival. See Auslen v. Thompson, 1940, 38 Cal.App.2d 204, 101 P.2d 136; Spiller v. Atchison, Topeka &

4. See Footnotes 2 and 3.

Santa Fe Ry. Co., 1920, 253 U.S. 117, 135, 40 S.Ct. 466, 64 L.Ed. 810.

In Van Choate v. General Electric Co., supra [245 F. 121], the court noted the distinction between mere injuries not resulting in profit to the wrongdoer and situations where the plaintiff might "waive the tort and sue in assumpsit", holding the latter to survive.

■ The complaint does not allege injury which is personal in its nature, but is generally grounded on a theory sounding in unjust enrichment. The measure of damages sought is that profit allegedly made by the defendants to which plaintiffs claim to be entitled. The injury upon which the cause of action was based affected property rights. In the light of the extensive survey of the common law regarding survivability and the logical and persuasive ultimate holding in the Barnes Coal Corporation case, I am constrained to follow it here, and hence the motion to amend for the purpose of substituting his executors in the place of the deceased plaintiff, Charles Street Mills, will be granted.

V

Some of the defendants object to the complaint on the ground that there is no provision for a *civil remedy* for violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C.A. § 78j(b) and Rule X-10B-5 of the Regulations of the Securities and Exchange Commission, CFR 240.10b(5). Early consideration of this objection should be given, for the disposition of the objection will affect all defendants.

■ It is true that there is no express provision for civil remedy in the particular section of the Act with which we are concerned. The objecting defendants stress that other sections of the Act, which make other practices not in issue here unlawful, provide for redress for aggrieved persons. They argue that this is a demonstration that Congress did not intend that violations of the section concerned in this allegation should be the basis for such claims. However, the argument is rejected in

the case Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 37 A.L.R.2d 636, wherein it is held that the weight of authority sustains the proposition that there is available a civil remedy for violations of the section of the Act and the regulations here in question. The Court said:

> "We can think of nothing that would tend more toward discouraging trading off the established business markets and out of governmental regulation or that would more certainly tend to deter fraudulent practices in security transactions and thus make the Act more 'reasonably complete and effective' than the right of defrauded sellers or buyers of securities to seek redress in damages in federal courts." 203 F.2d at page 632.

The authorities supporting its decision are cited in Note 15 on page 632 of the opinion. See also Slavin v. Germantown Fire Ins. Co., 3 Cir. 1949, 174 F.2d 799, 805. I am persuaded that the objection to the complaint on this ground must be overruled.

VI

Defendants also contend that the complaint does not allege facts which are appropriate for a class action, and that the number of disclaimers that have been filed and the failure of other stockholders to join the plaintiffs by intervention in the suit, bar the maintenance by the plaintiffs of the suit as a class action. Buttressing the last view the case of Oppenheimer v. F. J. Young & Co., 2 Cir., 1944, 144 F.2d 387, was cited in which it was held:

> "If it shall later appear that the plaintiffs are not able within a reasonable time to obtain others to intervene in the class action it may properly be dismissed as a class action because of lack of adequate representation of members of the class." 144 F.2d at page 390.

■ In the instant case it is disclosed that some of the shareholders of the Tacony-Palmyra Bridge Company granted options to defendants to purchase

their stock as a result of direct personal negotiation, others granted options as a result of the letter sent to them by the Sarjem Corporation (Annex 1), and still others were allegedly deprived of their stock by a process of redemption and recall. The first group has unanimously disclaimed any interest in these proceedings, so it is unnecessary to decide whether or not they appropriately would be members of the "class" of plaintiffs eligible to recover under the provisions relating to securities transactions accomplished through use of the mails. The third group, whose stock was acquired without voluntary acts on their part, also should be withdrawn from a class of plaintiffs who seek to recover under a statute relating to a purchase of securities by means of use of the mails to employ manipulative or deceptive devices. However, as to all those shareholders who voluntarily granted options to the Sarjem Corporation to purchase their stock between September 7, 1948 and October 22, 1948, i. e., the second group, it appears that the suit at bar is a "spurious" class suit of the sort authorized by Rule 23(a) (3) [5] of the Federal Rules of Civil Procedure, since they seek a common relief conditioned upon resolution of common questions of law. This view is supported by the case of Speed v. Transamerica Corp., D.C.Del. 1951, 99 F.Supp. 808, wherein a class action was held to be appropriate for the redress of shareholders of a subsidiary corporation who were misled into disposing of their shares of stock by virtue of a letter from the parent corporation which failed to disclose pertinent facts. See also Zahn v. Transamerica, 3 Cir., 1947, 162 F.2d 36, 49, 172 A.L.R. 495.

Nor does the failure of stockholders, in the same class as plaintiffs, to intervene in the suit appear to be a bar to its maintenance as a spurious class action at this stage even in the light of the Oppenheimer case cited above.

## VII

Much testimony has been taken in deposition form in the nature of pre-trial discovery. No substantial fact question appears to be in controversy and all sides move for summary judgment.

It now remains to determine whether the allegations of the amended complaint give rise to a finding that the conduct of the various defendants was violative of the pertinent provisions of the Securities Exchange Acts and Regulations in such a manner as to entitle plaintiffs to recover damages.

Plaintiffs allege that the conduct of the defendants was fraudulent in that the letter, Annex I, failed to disclose to them that the ultimate purpose behind the purchase of the capital stock of the Tacony-Palmyra Bridge Company embodied a resale of the property at a substantial profit.

The provision of the Securities Exchange Act of 1934 and the Regulation allegedly violated by the conduct of the defendants are as follows:

### The Act

Section 10.

"Manipulative and deceptive devices

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—* * * .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance

---

**5.** "Rule 23. Class Actions

"(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is * * *

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

764

in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S. C.A. § 78j.

The Regulation

Rule X–10B–5:

"Employment of Manipulative and Deceptive Devices by Any Purchase of a Security

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

Plaintiffs charge in great detail that long before the crystallization of the plan to acquire the Tacony stock the officers of Chemical knew of it and regarded it as a piece of business which would be highly profitable to their banking house; that they had early conversations with Ketcham and Nongard with reference to this objective; that Chemical had transactions involving the acquisition of bridges and resale to public authorities previously in other states with Ketcham and had similarly cooperated with Sherritt and Sarjem in at least one previous transaction at Vicksburg; that Chemical knew of the various profits that would be made by others and agreed through its officers with Mulligan and Sherritt to supply the loans to Burlington-Bristol Bridge Company and Sar-

jem without which the plan could not be effected, and that it agreed to buy a substantial quantity of the Bridge Commission bonds ultimately to be issued.

B. J. Van Ingen & Co., Inc., is similarly charged through its officers, Van Ingen and Couffer, with knowledge similar in nature to that brought home to Chemical and with the motive of earning large fees, commissions and profits in the ultimate sale and distribution of the bonds to be floated by the Commission.

It is the contention of the plaintiffs that the knowledge upon the part of those parties who participated in the transactions indirectly bringing about the culmination of the plan made them as responsible as those who acted directly to achieve the purpose. Their knowledge and their acts, it is contended, made them culpable as violators of the section of the Act and the rule above quoted.

■ There seems to be no question but that the sellers and purchasers of the shares of stock dealt at arm's length, and that the selling shareholders were plainly on notice of the fact that the purchasing syndicate designed to obtain all of the capital stock of the corporation. Surely plaintiffs must have anticipated the likelihood that the defendants had a profit-making purpose in mind, especially when the price per share offered to them was substantially higher than the market value of the shares. The entire field of securities transactions is to some degree speculative in nature, and sales are usually motivated by a difference in opinion between vendor and purchaser regarding the future prospects of the particular security involved. Such was clearly the case here, and in the absence of any fiduciary duty it was not incumbent upon the defendants to divulge their plans with respect to a subsequent resale of the property. The cases imposing a duty on the part of a purchaser of shares of stock to disclose his knowledge of future prospects and plans all involve situations where the purchaser holds a fiduciary position and where the knowledge has been obtained

by virtue of an "inside" position. Cf. Northern Trust Co. v. Essaness Theatres Corp., D.C.N.D.Ill.1952, 103 F.Supp. 954; Kardon v. National Gypsum Co., D.C. E.D.Pa.1947, 73 F.Supp. 798.

In the case of Speed v. Transamerica, supra, the court said:

"It is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. * * *" 99 F.Supp. at pages 828–829.

The contention is not justified that on September 7, 1948, when the letters and option offers were mailed to the plaintiffs, any defendants occupied an inside position which would create any fiduciary duty of disclosure on their part. At all times prior to October 7, 1948, the defendants had, at most, options to purchase shares of stock and contingent proxy voting rights in the shares, which would vest only upon a deposit of $6,487,-500 in a bank.

If it is to be assumed, as plaintiffs would have it, that defendants became insiders at the time the escrow deposit was made and Sarjem's nominees occupied positions as directors of Tacony-Palmyra Bridge Company, they cannot be said at that time, by reason of their newly-created position, to have come into any inside information unknown to the sellers of their stock. They of course knew then, as they had known long before, that they intended to dispose of the Tacony-Palmyra stock at a profit. No information came to them upon their achievement of control over the stock which they were under a duty to impart to the stockholders from whom

they had purchased, or even to those from whom they were subsequently to purchase. Furthermore, the better than 80% of the stockholders who had signed agreements by that time could not claim that they had been induced to sign the agreements by "insiders" because up until then the defendants cannot be said to have been "insiders". In short, the alleged scheme to capitalize upon the ownership of the stock of the Tacony-Palmyra Bridge Company was conceived and prosecuted strictly by "outsiders" upon whom there was no duty of disclosure.

Plaintiffs also allege that defendants are chargeable with an affirmative misrepresentation by virtue of the inclusion of the following paragraph by the Sarjem Corporation to each shareholder of the Tacony-Palmyra Bridge Company in Annex I, wherein it is stated:

"For your information the holders of approximately 35% of the Class A Stock, and 60% of the Common Stock, have heretofore entered into an agreement (identical in form to the agreement enclosed herewith) for the sale of their shares to the undersigned."

It is plaintiffs' contention that the receipt of severance pay and counsel fees by certain officers, directors and attorneys of the Tacony-Palmyra Bridge Company (involved in the Niessen group as heretofore described) constituted a variation in the terms under which they sold their shares of stock from the conditions of sale set forth in Annex I. However, it is clear that the Niessen group signed options to purchase and offers of proxy voting power identical in substance to those submitted to the plaintiff shareholders. Furthermore, the severance pay and counsel fees were voted by the outgoing Board of Directors, not the representatives of defendants. These sums were not unreasonable, and in fact the bulk of the severance pay was paid to non-officer employees of the company on the basis of length of service and rate of pay. In addition, the

letter of September 7, 1948, from the Sarjem Corporation, contained a statement that it would, upon request, furnish information concerning the financial condition of the Bridge Company. There is no showing that plaintiffs requested such information, or that a request would not have resulted in a disclosure of the above payments.

While the complaint contains overtones of an implied collusion between the Niessen group and the defendants, no such allegation is made, and the plaintiffs did not aver that the Niessen group was privy to the conspiracy, nor are any members of the Niessen group named as defendants in the current action. Accordingly there is nothing to show that the paragraph in question, contained in the letter of September 7, 1948, from the Sarjem Corporation, Annex I, constituted a misrepresentation.

◼ It is contended that the defendant Buckley Securities Corporation violated 15 U.S.C.A. § 78o(c) [6] and Rules X–15C1–2 [7] and X–15C1–5 [8], as well as 15 U.S.C.A. § 78j and Rule X–10b–5, since Buckley was a broker or dealer as defined in the Act, when it issued the letter to the shareholders of Tacony dated September 7, 1948, Annex 3. The plaintiffs charge the following language

6. "Sec. 15. (U.S.C.A. § 78o) Over-the-counter markets; registration of brokers; information and reports. * * *

"(c) (1) No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of any security (other than commercial paper, bankers' acceptances or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance. The Commission shall, for the purposes of this subsection, by rules and regulations define such devices or contrivances as are manipulative, deceptive, or otherwise fraudulent.

"(2) No broker or dealer shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, in connection with which such broker or dealer engages in any fraudulent, deceptive, or manipulative act or practice, or makes any fictitious quotation. The Commission shall, for the purposes of this paragraph, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative and such quotations as are fictitious."

7. "Rule X–15C1–2: Fraud And Misrepresentation

"(a) The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in Section 15(d) (1) of the Act, is hereby defined to include any act, practice or course of business which operates or would operate as a fraud or deception upon any person.

"(b) The term 'manipulation, deceptive, or other fraudulent device or contrivance,' as used in Section 15(c) (1) of the Act, is hereby defined to include any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading.

"(c) The scope of this rule shall not be limited to any specific definitions of the term 'manipulative, deceptive, or other fraudulent device or contrivance' contained in other rules adopted pursuant to Section 15(c) (1) of the Act."

8. "Rule X–15C1–5: Disclosure of Control

"The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in Section 15(c) (1) of the Act, is hereby defined to include any act of any broker or dealer controlled by, controlling, or under common control with, the issuer of any security, designed to effect with or for the account of a customer any transaction in, or to induce the purchase or sale by such customer of, such security unless such broker or dealer, before entering into any contract with or for such customer for the purchase or sale of such security, discloses to such customer the existence of such control, and unless such disclosure, if not made in writing, is supplemented by the giving or sending of written disclosure at or before the completion of the transaction."

to be deceptive and violative of the aforesaid provisions:

> "We are familiar with the financial condition of the Bridge Company and with its prospects. In our opinion, the prices offered for its securities are fair and adequate and we feel that it is to the distinct advantage of each holder of securities of the Bridge Company to accept the offer explained above."

In the light of the circumstances the above statement was not by any means a misrepresentation. The prices offered, being in excess of the book values or market prices, could be described as "fair and adequate" and "to the distinct advantage" of the sellers. Indeed the scheme, information of which plaintiffs complain was withheld from them, whereby it was sought to gain huge profits, was highly speculative and uncertain, both as to its ultimate materialization and its legality as time has told.

█ The plaintiffs would also impute blame upon the defendants for newspaper articles, contained in the editions of the New York Times and the Wall Street Journal of September 8, 1954, wherein it was erroneously reported that the letter sent by the Sarjem Corporation to the shareholders of the Bridge Company contained a statement to the effect that the $6,487,500 escrow deposit had already been made. However, there is no allegation that any of the defendants were responsible for the reports or that they had any knowledge of them. Nor is there any allegation that the plaintiffs relied on these reports in signing and submitting the options to purchase their shares. Indeed, it is unlikely that such reliance would have been reasonable or justifiable in view of the fact that the plaintiffs had received the letters which in fact contained no such statement. They can hardly be heard to complain that they had been moved to change their position by a misstatement in the newspapers which differed from the text of the letters in their possession.

VIII

Additionally, the following provisions of the Securities and Exchange Act of 1934 and the regulations thereunder were alleged by plaintiffs to have been violated by Sarjem:

(The Act)

"(a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect to any security (other than an exempted security) registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. § 78n(a).

(The Rules)

"Information to be furnished security holders.

"(a) No solicitation subject to §§ 240.14a–1 to 240.14a–9, inclusive, shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A." 17 F.C.R. § 240.-14a–3.

"Requirements as to proxy.

\*    \*    \*    \*    \*    \*

"(e) The proxy statement or form of proxy shall provide, subject to reasonable specified conditions, that the shares represented by proxy will be voted and that where the person solicited specifies by means of a ballot provided pursuant to paragraph (b) of this section a choice with regard to any matter to be acted upon, the shares will be voted in accordance with the specifications so made." 17 F.C.R. § 240.14a–4(e).

"Material required to be filed. (a) Three preliminary copies of the proxy statement and form of proxy and any other soliciting material to be furnished to security holders, concurrently therewith shall be filed with the Commission at least 10 days prior to the date definitive copies of such material are first sent or given to security holders, or such shorter period prior to that date as the Commission may authorize upon a showing of good cause therefor." 17 F.C.R. § 240.14a–6(a).

"False or misleading statements. No solicitation subject to §§ 240.-14a–1 to 240.14a–9, inclusive, shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 F.C.R. § 240.14a–9.

Sarjem, it is contended, in failing to send proxy statements to the stockholders solicited by it, and failing to file statement with the Securities and Exchange Commission, violated the foregoing provision of the Act and the above and other rules applicable to solicitation of proxies. It is argued that it was through the proxies that defendants were enabled to conceal the truth from the security holders and enabled to effectuate the transactions whereby the ultimate transfers were made. Emphasis is laid by the plaintiffs on the fact that at the time the proxies were solicited Sarjem was not a beneficial owner, exempt from the requirements to furnish proxy statements under Rule 14a–2(c), 17 F.C.R.

227, and that since the proxies were irrevocable from the time signed and the purchase of the securities by Sarjem was optional and conditional, the requirement for such filing of statements was particularly Sarjem's burden.

While it is true that the signer of the form (Annex 2) agreed irrevocably to give the option and proxy from the time he signed until November 1, 1948, there was no right in Sarjem to make use of the proxy until the escrow moneys had been deposited. On October 22, 1948, when this occurred, the signer of the form was no longer interested in the stock. His interest was the promised purchase price thereof which was secured to him by the deposit in escrow. Sarjem, on the other hand, was vested with the beneficial interest in the stock itself from that time. The plaintiffs called the escrow deposit a sham, but the fact is that plaintiffs and the other stockholders, in due course, in accordance with the option commitments, received payment for their stock. It seems plain, then, that Sarjem acquired nothing but the agreement that it would have the right to acquire the proxy up to November 1, 1948, providing it fulfilled the conditions of the escrow. Sarjem did not acquire an irrevocable proxy upon the delivery of the offer, Annex 2, and cannot be said to have *solicited* proxies as contemplated by the Rule, since the letter, Annex 1, and the offer, Annex 2, did not seek to place Sarjem in position to vote the stockholders' shares in the normal sense of the delivery of a proxy so to do.

Moreover, even if it were found that defendants violated the above provisions of the 1934 Act and the Rules by failing to submit proxy statements, such violation cannot be said to be related in any way to the damages sought to be recovered by the plaintiffs. The relief for which the plaintiffs prayed is grounded upon fraud and unjust enrichment, which is not in any way connected with the preparation and filing of proxy statements, since there is no requirement that such statements disclose information of

the type that plaintiffs allege was wrongfully withheld from them.

### IX

■ Plaintiffs also allege that the Sarjem Corporation was a "broker-dealer" as defined in 15 U.S.C.A. § 78c, and that its failure to register as such with the Commission constituted violations of Sections 15(a) and 15(b) of the 1934 Act, 15 U.S.C.A. §§ 78*o*(a) and (b).[9] It is not necessary to decide whether or not these particular allegations are sustainable, for the assertion that a failure by Sarjem to register had any causal connection with the damages alleged by the plaintiffs cannot be regarded seriously.

### X

Plaintiffs also charge a violation of Section 5 of the 1933 Act, 15 U.S.C.A. § 77e(a), which reads as follows:

"Prohibitions relating to interstate commerce and the mails

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

■ The argument of plaintiffs, in essence, is that the solicitation of proxies by the defendants amounted to a "security" in the nature of a Certificate of Deposit, as defined in 15 U.S.C.A. § 77b(1) and that use of the mails in connection therewith constituted violation of the above-quoted section. Such an argument has no merit. It is inconceivable that the letter of solicitation sent by the Sarjem Corporation to the shareholders of the Tacony-Palmyra Bridge Company could be considered to be a "certificate of deposit", since the latter is an instrument which acknowledges a receipt and deposit of funds. Furthermore, there was no use of the mails "to sell or offer to buy" the solicitation, nor "for the purpose of sale or delivery after sale" of the solicitation, even assuming that the letter might be a "security." Accordingly, there could be no violation of 15 U.S.C.A. § 77e. Moreover, even had the defendants' conduct in this regard constituted a technical violation of the 1933 Act, such violation would not in itself be proof of plaintiffs' alleged harm. On the contrary, a failure to register a security is so remote from the damages alleged by the plaintiffs as to be without pertinence.

### XI

■ The plaintiffs conceive themselves entitled to exemplary damages and laid the allegations for the recovery thereof in their amended complaint.

---

9. "Over-the-counter markets; registration of brokers; information and reports

"(a) No broker or dealer (other than one whose business is exclusively intrastate) shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, unless such broker or dealer is registered in accordance with subsection (b) of this section.

"(b) A broker or dealer may be registered for the purposes of this section by filing with the Commission an application for registration, which shall contain such information in such detail as to such broker or dealer and any person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such broker or dealer, as the Commission may by rules and regulations require as necessary or appropriate in the public interest or for the protection of investors. Except as hereinafter provided, such registration shall become effective thirty days after the receipt of such application by the Commission or within such shorter period of time as the Commission may determine. * * *"

770

They are not in any event entitled to more than *actual* damages in the light of Section 28 of the Securities Exchange Act, 15 U.S.C.A. § 78bb, which provides:

"* * * no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of."

## XII

Particular stress is placed by plaintiffs on their claim for recovery of $212,500 received by Sarjem on its delivery of the shares which it succeeded in gathering as a result of its solicitation. They contend that though the New Jersey Supreme Court in the case of Driscoll v. Burlington-Bristol Bridge Company, supra, cleared this profit in the bonds of Sarjem as untainted by fraud, that holding was not res adjudicata as to them. As we have viewed the activity of Sarjem, we find no fraud perpetrated by it on the plaintiffs or their class and hence no ground for judgment in their favor in that sum.

## XIII

Viewing the amended complaint and all that the plaintiffs have offered by way of evidence and argument, it is apparent that they are seeking damages for having been induced to sell their stock by means which allegedly violated provisions of the Securities and Exchange Acts or to have their stock returned to them.[10] They measure their damages by the profits sought to be realized by the defendants upon the stock with which they parted.

These they say should be paid to them regardless of the fact that the defendants have been required to disgorge them by judgment in the Driscoll suit. But the plaintiffs' standard of measurement fails because it was fraught with fraud and corruption and is nonexistent in the light of the Driscoll judgment directing restitution. In this respect plaintiffs' argument that defendants have not satisfied the judgment in that case is frivolous. Furthermore, it cannot be overlooked that the plaintiffs received a price for their shares far in excess of the then current market or book values of their stock and have failed to show that the actual values of the shares were greater than the sums which they received for them except as measured by the rotted fruits of illegality.

The plaintiffs show no wrong or damage to themselves and therefore are entitled to no redress.

As indicated in footnote 3 herein, plaintiffs' motion for leave to file its amended complaint is granted except in so far as it includes the Burlington County Bridge Commission as an additional defendant. In view of the turn of this decision its addition as a defendant would be a futility.

The motions of the defendants Chemical Bank & Trust Company, B. J. Van Ingen & Co., Inc., The Sarjem Corporation, Tuthill Ketcham, Richard C. Nongard and Rowland H. Murray, individually and trading as the firm of Ketcham & Nongard, Robert M. Sherritt, Robert R. Greig, John E. Weinstock, William C. Mulligan, Clifford R. Powell, Paul A. Powell, Irene Powell, Mildred Powell

10. Their prayer for rescission is obviously made "with tongue in cheek" since they simultaneously suggest that "if such rescission cannot be decreed because of intervening equities of bona fide purchasers for value of bonds a decree [should issue] impressing an equitable lien upon the Tacony-Palmyra bridge and all revenues therefrom for all income, profits and emoluments from the operation thereof existing on and from October 22, 1948 to the present [date of amended complaint, March 9, 1954] subject only to the prior claim thereon of any such bona fide purchaser for value of bonds specifically excluding" * * * [the same bondholders excluded by the New Jersey Supreme Court in Driscoll v. Burlington Bridge Co., supra].

Under the decision in the Driscoll case the revenues from the bridges are directed to be applied to the liquidation of the bonds and there are to be no profits. The plaintiffs' alternative prayer in this respect is therefore futile.

Meader, Theodore R. Hanff, T. R. Hanff & Co., Inc., Thomas J. Christensen, Rickard W. Parks, Gladys Parks, Robert K. Bell, Fitzgerald & Co., Buckley Securities Corporation, John A. Meyer, Frank A. Snover, Tacony-Palmyra Bridge Company and Burlington - Bristol Bridge Company for dismissal of the complaint and for summary judgment in their favor are granted.

The motion of the plaintiffs for summary judgment against the defendants is denied.

The foregoing shall be considered in satisfaction of the requirements of the Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A., for findings of fact and conclusions of law.

## ANNEX 1.

The Sarjem Corporation
105 South La Salle Street
Chicago

September 7, 1948

To the Holders of Preferred Stock, Class A Stock and Common Stock of Tacony-Palmyra Bridge Company:

We are sending you herewith three copies of an agreement which embodies an offer on the part of the undersigned to purchase, on the terms and conditions therein expressed, your entire holdings of 5% Cumulative Convertible Preferred Stock ($100 par value) of the Bridge Company at a price of $154.87½ per share (the equivalent of $88.50 per share for the Class A Stock into which each such share is convertible—said Preferred Stock being callable at $107 per share between May 1, 1948 and May 1, 1949) and all of the 75 cent Cumulative Participating Class A Stock without par value, and all of the Common Stock without par value, of the Bridge Company at a price of $88.50 per share. As provided in said agreement, dividends declared on August 17, 1948 belong to the existing stockholders and, in addition, the prices mentioned above increase proportionately if the Date of Closing is later than September 30, 1948. An identical offer is being made to each shareholder and the under-signed is prepared and desires to purchase all outstanding shares of each class of such stock at said prices and on said terms and conditions.

For your information, the holders of approximately 35% of the Class A Stock, and 60% of the Common Stock, have heretofore entered into agreements (identical in form to the agreement enclosed herewith) for the sale of their shares to the undersigned.

The aforesaid agreement provides for a final closing on or prior to November 1, 1948, and for the payment of the purchase price for said shares of stock in cash against delivery as therein explained. Under the plan of procedure contemplated by said agreement, it is not necessary for you to deposit any of your securities in escrow. All that is necessary at this time to accept the aforesaid offer is to fill out and execute in *duplicate* the enclosed agreement.

The Bridge Company has kept you advised of its past and current earnings, and we shall be happy to furnish you, from data furnished us by the Bridge Company, any additional information concerning its financial condition or earnings which you may desire.

Included among the holders of stock who, as stated above, have executed agreements in the form enclosed, are Leo Niessen, Arthur A. Niessen, Grover C. Richman, Henry J. Sherman and Fidelity Philadelphia Trust Company, Philadelphia, Pennsylvania.

If, after due consideration, the offer embodied therein meets with your approval, and you desire to accept it, please fill out and sign, *in duplicate*, (with signature guaranteed as indicated thereon) the form of letter agreement transmitted herewith, and return it in the enclosed envelope. One of such copies will be executed by the undersigned and returned to you.

Yours very truly,
The Sarjem Corporation
By R. M. Sherritt
President.

ANNEX 2.

————, 1948

The Sarjem Corporation
105 South La Salle Street
Chicago 3, Illinois.

Gentlemen:

The undersigned is the registered owner and holder of the following described securities of Tacony-Palmyra Bridge Company, a New Jersey Corporation, (hereinafter called the "Company"):

(a) Preferred Stock Certificate(s) numbered ————

————

and representing ———— shares of the 5% Cumulative Convertible Preferred Stock ($100. par value) of the Company, (hereinafter called "Preferred Stock"):

(b) Class A Stock Certificate(s) numbered ————

————

and representing ———— shares of the 75 cent Cumulative Participating Class A Stock without par value of the Company .(hereinafter called "Class A Stock");

(c) Common Stock Certificate(s) numbered ————

————

and representing ———— shares of the Common Stock without par value of the Company (hereinafter called "Common Stock").

The undersigned hereby agrees to sell to you, or your assigns and, subject to the conditions hereinafter expressed, you agree to purchase from the undersigned, all of the Preferred Stock described above (or any shares of capital stock into which the same may be changed or converted) at $154.87½ per share of such existing stock, plus a sum equal to $0.017½ per share for each calendar day elapsing after September 30, 1948 to and including the Date of Closing, and all of the shares of Class A Stock and Common Stock of the Company described above (or any shares of capital stock into which

the same or either of said classes may be changed or converted) at $88.50 per share of such existing stock, plus a sum equal to $0.01 per share for each calendar day elapsing after September 30, 1948 to and including the Date of Closing. It is understood that the undersigned also shall be entitled to receive from the Company on all shares owned by him on the respective record dates the dividends declared on August 17, 1948, and hereinafter described. It is further agreed that you will pay for the account of the undersigned all transfer taxes payable in respect of the sale of said shares to you and that you will deduct the same from the purchase price due to the undersigned.

It is understood and agreed that if the Company, prior to November 1, 1948 shall redeem or purchase all or any part of said Preferred Stock, Class A Stock and Common Stock, or any shares of capital stock into which said Preferred Stock, Class A or Common Stock may be changed or converted, at a price equal to that specified above, your obligation to purchase any Preferred Stock, Class A Stock, Common Stock or other stock so redeemed or purchased shall cease, but this agreement shall remain in full force and effect as to any of such shares of stock not so redeemed or purchased.

It is further understood and agreed that your obligations under this agreement shall be fulfilled on or prior to November 1, 1948, and the undersigned hereby agrees to deliver certificates representing such Preferred Stock, Class A Stock, Common Stock, or other capital stock, endorsed in blank ready for transfer with signature properly guaranteed by a bank or a firm having membership on a recognized stock exchange, and in either case having an office or a correspondent in, Philadelphia, Pennsylvania, to Fidelity-Philadelphia Trust Company, Philadelphia, Pennsylvania (hereinafter called "Fidelity-Philadelphia"), upon receipt by the undersigned of notice from Fidelity-Philadelphia that it then holds a sum or sums in cash sufficient to permit it to pay forthwith to the undersigned,

an amount equal to the full purchase price payable hereunder in respect of the shares of stock described above. The "Date of Closing," as used herein, shall mean the date upon which said notice shall be sent by the Fidelity-Philadelphia to the undersigned by registered mail to the address specified below.

In consideration of your undertaking in this agreement expressed, and in furtherance of your obligation to purchase said shares of Preferred Stock, Class A Stock and Common Stock, the undersigned being the record holder and owner of the aforesaid Preferred, Class A and/or Common Stock of Tacony-Palmyra Bridge Company does hereby appoint and constitute Alexander J. Moody, Paul T. Kessler, Jr., and John L. Behr, or any one or more of them, the sole and exclusive lawful proxy or proxies and attorney-in-fact of the undersigned with the full and unqualified right and power to vote and to execute waivers of notice with respect to all such shares of capital stock at or of any and all meetings of stockholders held on or subsequent to the date upon which there shall have been deposited with Continental Illinois National Bank & Trust Company of Chicago, Chicago, Illinois, in escrow the sum of $6,487,500.00 to be used on or prior to November 1, 1948, for the purchase or redemption of all of the outstanding capital stock of the Company, for and in the name, place and stead of the undersigned, according to the number of votes which the undersigned may at any time be entitled to cast, hereby granting to said proxy or proxies full power and authority to act for the undersigned and in his name and place as fully as the undersigned could if personally present at such meetings, with full power of substitution, hereby ratifying and confirming all that his said proxy or proxies may do by virtue hereof, and the undersigned hereby agrees that he shall have no right to revoke the authority so granted until November 1, 1948.

It is further understood and agreed that your obligations under this agreement are expressly subject to and are hereby conditioned upon:

(a) The securing by you of agreements substantially similar to this agreement executed by the registered owners and holders of not less than 80% of each Class of the shares of Preferred Stock, Class A Stock and Common Stock of the Company at any time outstanding, provided, however, that you may in your discretion waive this requirement or condition in whole or in part at any time without notice of any kind to the undersigned.

(b) The securing by you of audit reports of Messrs. Haskins & Sells, Accountants, verifying the actual financial condition of the Company at the Date of Closing of this Agreement.

(c) The delivery to you by the Company, or the securing by you, of satisfactory reports by Messrs. Modjeski & Masters, consulting engineers, as to the physical condition of the bridge owned by the Company, at the Date of Closing, showing that up to the Date of Closing said bridge has not been destroyed or substantially damaged, whether or not insured.

(d) The receipt by you of the favorable supplemental legal opinions of Messrs. Winston, Strawn & Shaw, or other counsel satisfactory to you, as to the franchises owned by the Company, titles of the Company to its properties, easements and rights of way, the validity of its capital stock and of its corporate organization and existence, for the period from August 15, 1948 to Date of Closing.

(e) The condition that the Company, at the Date of Closing, shall have current assets exceeding its current liabilities, after making full and adequate provision for all taxes, federal, state and local for the current year and for all prior years, by an amount not less than $616,800 (less any payments made on account of the principal of the mortgage between January 1, 1948 and the Date of Closing) and also have at said Date of Closing, after such provision for taxes, a com-

bined capital and surplus (including reserves) of not less than $2,547,700, in each case determined jointly by Ricker, Sheldon and Co. and Messrs. Haskins & Sells in accordance with accepted accounting principles, and the further conditions that the Company, between June 30, 1948 and the Date of Closing, except as consented to by you, shall not have (1) declared or paid any dividends (except the dividends declared on August 17, 1948,—namely $1.25 per share on the Preferred Stock payable November 1, 1948 to holders of record on September 17, 1948, and $1.00 per share on the Class A Stock and Common Stock, respectively, payable October 1, 1948 to holders of record on September 15, 1948), or (2) incurred any indebtedness, except in the usual and ordinary course of business (including repairs to bascule floor, estimated at approximately $75,000, any part of which remaining unpaid or unexpended at the Date of Closing shall be treated as a current liability for the purposes of this paragraph), or issued any new or additional bonds, debentures or other evidences of indebtedness, or (3) issued any additional shares of capital stock, or (4) made or entered into any unusual expenditures, disbursements or commitments for capital account, or otherwise, or (5) entered into any agreements or contracts not in the ordinary course of business, and shall not at the Date of Closing be a party to any litigation in which its title to any substantial portion of its assets is questioned or which may prevent in any way the consummation of the transactions contemplated hereby.

The undersigned understands that this agreement, which is executed in duplicate, is satisfactory to you, and after you have executed the acceptance hereon and returned the copy hereof to the undersigned this letter shall constitute a valid and binding agreement between us.

Very truly yours,

Address:

_____

_____

_____

(Name, or signature, if individual)*

By _____

(Signature of person signing on behalf of another or in a representative capacity)*

(Title or designation of capacity)

Signature guaranteed:

_____

(To be guaranteed by a bank or a firm having membership on a recognized stock exchange and in either case having an office or correspondent in New York, N. Y., or Chicago, Illinois.)

Accepted at Chicago, Illinois,
this —— day of ———, 1948.
The Sarjem Corporation
By ———————
Its ———————

If securities are owned or held by an individual, the signature of such individual is sufficient, unless acting through an attorney or agent, in which case the name of the principal should be written out and the signature of the attorney or agent affixed, and evidence of the power of such attorney or agent to sign should accompany the agreement.

If securities are owned or held by a corporation or partnership, the agreement should be signed in its behalf by its president or vice-president, or a partner, as the case may be.

If securities are owned or held by an executor, administrator, trustee, or other fiduciary, the agreement should be signed by such fiduciary, disclosing such capacity, and evidence of the authority to act and power to sell such securities should accompany the agreement.

ANNEX 3.
Buckley Securities Corporation
1420 Walnut Street
Philadelphia 2

September 7, 1948

To the Holders of Preferred Stock, Class A Stock and Common Stock of Tacony-Palmyra Bridge Company:

We have received from The Sarjem Corporation, of Chicago, Illinois, for the information of our customers and other interested persons, a form of agreement, three copies of which are enclosed, which embodies an offer on the part of Sarjem to purchase, on the terms and conditions therein expressed, (1) all shares of 5% Cumulative Convertible Preferred Stock ($100 par value) of the Bridge Company owned by each security holder at a price of $154.87½ per share (the equivalent of $88.50 per share for the Class A Stock into which each such share is convertible —said Preferred Stock being callable at $107 per share between May 1, 1948 and May 1, 1949) and (2) all shares of the 75 cent Cumulative Participating Class A Stock (without par value) and Common Stock (without par value) of the Bridge Company owned by each security holder at a price of $88.50 per share. As provided in said agreement, dividends declared on August 17, 1948, belong to the existing stockholders and, in addition, the prices mentioned above increase proportionately if the Date of Closing is later than September 30, 1948.

We are informed that the holders of approximately 35% of the aforesaid Class A Stock, and 60% of the Common Stock have heretofore entered into agreements with The Sarjem Corporation (identical in form to the agreement enclosed herewith) for the sale of their shares to Sarjem.

Under the plan of procedure which is contemplated by said agreement, it is not necessary for you to deposit your securities in escrow. All that is necessary at this time to accept the aforesaid offer is to fill out and execute *in duplicate* the enclosed agreement, have your signature guaranteed, and return it to the under-signed in the self-addressed envelope which requires no postage. We will arrange to have The Sarjem Corporation sign the acceptance thereof and return your copy to you.

We are familiar with the financial condition of the Bridge Company and with its prospects. In our opinion, the prices offered for its securities are fair and adequate and we feel that it is to the distinct advantage of each holder of securities of the Bridge Company to accept the offer explained above. Therefore, we recommend that you fill out and sign, *in duplicate,* (with signature guaranteed as indicated thereon) and return to us in the enclosed envelope, the form of letter agreement transmitted herewith. You will be advised later of any further steps required to be taken by you in order to obtain final payment for your securities under said agreement.

Yours very truly,
Buckley Securities Corporation
By Edward S. Buckley
Assistant Secretary