### In re SAXON SECURITIES LITIGATION.

### Nos. 82 Civ. 3103 (MJL), 83 Civ. 3760.

United States District Court, S.D. New York.

Oct. 30, 1985.

Marion R. Probst, Wolf Popper Ross Wolf & Jones, New York City, New York (Robert A. Skirnick, of counsel), Herbert Milstein, Kohn Milstein Cohen & Hausfeld, Washington, D.C., Stephen P. Hoffman, Pomerantz Levy Haudk Block & Grossman, New York City, Gerald J. Rodos, Barrack, Rodos & Bacine, Philadelphia, Pa., Daniel W. Krasner, Wolf Haldenstein Adler Freeman & Herz, New York City, for Saxon.

Jules Brody, Stull, Stull & Brody, New York City, for Lewis.

Ellen R. Nadler, Kramer, Levin, Nessen, Kamin & Frankel, Elliot Cohen, Parker Chapin Flattau & Klimpl, Richard W. Brewster, Moses & Singer, New York City, James F. Mauze, Moline, Tegethoff, Ottsen, Mauze & Leggat, St. Louis, Mo., Susan Rosenthal, Winick & Rich, P.C., New York City, Bernard M. Gross, Gross & Sklar, P.C., Philadelphia, Pa., David M. Furbush, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendants.

Anthony Dean, Windels, Marx, Davies & Ives, New York City (Roy H. Carlin, Cliff A. Skibinski, of counsel), for objectors.

Stephen M. Sacks, Arnold & Porter, Washington, D.C., Martin Flumenbaum, Paul, Weiss, Rifkind, Wharton & Garrison, Kenneth Handal, Hall, McNicol, Hamilton, Clark & Murray, Harvey Greenfield, New York City, Spector, Cohen, Gadon & Rosen, P.C., Berger & Montague, P.C., Philadelphia, Pa., Meltzer Lippe and Goldstein, P.C., Mineola, N.Y., Goodkind Wechsler Labaton & Rudoff, Melvin H. Heiko, Keiko, Bush & Levy, New York City, Tanick & Heins, Minneapolis, Minn., Abbey & Ellis, Barr & Bello, New York City, David B. Gold, P.C., San Francisco, Cal., David Jaroslawicz, New York City, Greenfield & Chimicles, P.C., Haverford, Pa., Max W. Berger, Bernstein, Litowitz, Berger & Grossman, Victor Gleser, Ford Marrin Esposito & Witmeyer, New York City, other counsel.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

This action represents the consolidation of many class actions which in turn represent but one part of a complex of securities fraud cases. By memorandum opinion and order, of even date herewith, we approved the settlement of these consolidated class actions for approximately $20 million.[1] In approving the settlement as fair, reasonable and adequate pursuant to Fed.R.Civ.P. 23(e) we reserved judgment on the Plan of Distribution ("Plan") of the class settlement fund insofar as it would distribute the fund to class members rather than the current holders of the debentures in question. Presently before the Court are the objections of two such debenture holders. For the reasons stated below we deny their objections and approve the Plan in its entirety as submitted by class plaintiffs' lead counsel.

*Background*

The consolidated class actions are part of the litigation following the collapse of Saxon Industries Inc. ("Saxon").[2] Until the Spring of 1982 Saxon, from all outward appearances, was a financially healthy corporate giant engaged in three principal lines of business: (1) a paper and paper

---

1. The settlement sum of $18,150,000 plus accrued interest was deposited in escrow March 22, 1985.

2. For discussions of the related cases, *see, Crocker Nat. Bank v. Fox & Co.,* 103 F.R.D. 388 (S.D.N.Y.1984); *Northwestern Nat. Bank v. Fox & Co.,* 102 F.R.D. 507 (S.D.N.Y.1984); *In Re Saxon Industries, Inc.,* 43 B.R. 64 (S.D.N.Y. 1984); *In Re Saxon Industries, Inc.,* 39 B.R. 945 (S.D.N.Y.1984) (Edward J. Ryan, J.).

products manufacturing group; (2) a business products group, which manufactured, sold and leased photocopiers and related equipment and supplies; and (3) an advertising specialty group, which made calendars, playing cards and commercial gift items.

On March 30, 1982 Saxon reported an estimated pre-tax loss of $47 million for the fourth quarter of fiscal 1981, and indicated that it might incur, an additional $40–$50 million charge against earnings. On April 8, 1982, Saxon announced that it was in default of certain debt obligations. One week later, Saxon filed a petition for relief under Chapter 11 of the Bankruptcy Code. The bankruptcy was widely publicized. Numerous actions were soon filed alleging, *inter alia* that Saxon's books and records had been falsified, and its public financial statements and other reports were materially misleading.

The class actions consolidated under the caption *In Re Saxon Securities Litigation*, 82 Civ. 3103 (MJL), were brought on behalf of purchasers of Saxon's securities during the period March 31, 1976 through April 15, 1982 (the "Class Period"). The Court certified a class pursuant to Fed.R.Civ.P. 23 consisting of all purchasers of Saxon securities (including debentures) during the class period.[3] The Second Consolidated Amended Complaint alleged that Saxon's former officers, directors and independent auditors, Fox & Company ("Fox"), violated § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 and the common law by dissemination of materially false and misleading financial statements and other documents.

As part of the global settlement of all Saxon related litigation $18,150,000 plus accrued interest was allocated to the claims of class members. The class settlements were presented to the court for approval pursuant to Fed.R.Civ.P. 23(e). Over 100,000 notices were mailed to class members. Notice was also published twice each in *The Wall Street Journal, The International Herald Tribune,* and *The London Financial Times.*[4] The Court held a hearing on September 20, 1985. No objections were made to the fairness, reasonableness or adequacy of the settlement itself, however, two objections[5] were made to the Plan of Distribution.

The objectors, Anthony Walsh ("Walsh") and Arnold Weber ("Weber") purchased bonds on the market after Saxon's petition in bankruptcy—*i.e.* after the class period ended. While clearly not members of the class, Walsh and Weber claim that by purchasing bonds from class members they became assignees of the class members' chose in action—the right to recover in this action. They argue that the Plan of Distribution should be amended so that they and other Post-Petition Debenture Purchasers (also collectively referred to hereinafter as the "PPDP's" or "objectors") receive that portion of the settlement apportioned to the class members who sold their bonds after the petition in bankruptcy. It is the PPDP's objection that is presently before the Court.

The objectors' arguments break down into four distinct claims: (1) that the purchaser and seller of the bonds intended that the rights to any future recovery be assigned to the purchaser; (2) that federal common law dictates on the sale of the bond, the automatic assignment of all rights; (3) that New York State law dictates automatic assignment of rights; and (4) that the underlying policy of the federal securities laws dictates automatic assignment of rights. Counsel for the class plain-

---

**3.** Excluded from the class are Saxon, its affiliates and subsidiaries, the named defendants, members of their immediate families, any entity in which any of the named defendants has a controlling interest, and the legal representatives, heirs, successors and assigns of any of the defendants.

**4.** Notice was also directed to the Post-Petition Debenture Purchasers.

**5.** One other "objection" was received, however, that objection was discussed in full in this Court's previous opinion and has no relevance here.

tiffs strongly oppose the PPDP's objections.

*Discussion*

We begin by observing that the objectors do not claim that they were victims of the alleged frauds at Saxon. Indeed they could not. The PPDP's, by definition, purchased their bonds after the petition in bankruptcy and therefore after widespread public disclosure of the alleged frauds.

During the class period the debentures in question [6] sold on the market at prices ranging from approximately $500 to $700 [7] per debenture ($1000 face value, due 1987–1990). After the petition in bankruptcy and the public disclosure of the alleged fraud on April 15, 1982, the debentures were traded between approximately $200 and $300 per debenture.[8] The market for the debentures did not disappear even after the disclosure and the bankruptcy because of an obvious perception that the bonds continued to have value. The PPDP's argue that the perception of continuing value was based on the belief that reorganization in bankruptcy *or* litigation might produce a return on the investment. The class plaintiffs, however, argue that the post-petition market for the debentures simply reflected the belief that the bondholders would receive a significant return solely from the bankruptcy reorganization.

Pursuant to the plan of reorganization of Saxon in the Bankruptcy Court (annexed as Exhibit "A" to the affidavit of Roy Carlin) the PPDP's received cash and securities valued at $333.33 per debenture—one third of the face amount. Thus a PPDP who purchased at the average price of $250

received an $88 profit for his investment. At oral argument counsel for the PPDP's argued that the PPDP's paid a substantial "opportunity cost" for the bonds, thus the purchase price was not $250, but rather $250 plus two years lost interest income. While this argument has surface appeal it does little to advance their case. Using the $250 average purchase figure and adding two years [9] simple annual interest at 10% the PPDP's profit becomes clear. The total cost of the bonds, including lost opportunity, is $302.50. The PPDP's therefore received an average premium over market return of $31. On the other hand if the average cost of $250 is subtracted from the bankruptcy recovery of $333.33 the PPDP's obtained a 35.2% profit for a two year investment. The PPDP's may argue that such a return was lower than they might have received for other investments of such a speculative nature, especially with the prevailing high interest rates of 1982–83. The short answer to that argument is simply that the investment market necessarily involves risk-taking and the securities laws were not designed to guaranty maximum profit.

*Was an Assignment Intended?*

The next argument made by the PPDP's is that there was some unspoken intent between the buyer and seller of the bonds that the right to recovery in any future class action was assigned to the buyer. At oral argument counsel alleged:

> What Mr. Walsh's affidavit states further is his intent. I think that this is most important, because it is uncontradicted. Mr. Walsh, who has sworn that he is a professional investor with some

---

**6.** During the Class Period, Saxon had outstanding the following classes of debentures: Saxon's 5¼% convertible subordinated debentures due April 30, 1990 (the "5¼% Debentures"); 6% subordinated debentures due 1990 (the "6% Debentures"); and 5¾% convertible subordinated debentures due October 31, 1987 (the "5¾% Debentures"). The 5¼% and the 6% Debentures, were originally issued by Standard Packaging Corporation ("Standard") on April 30, 1965 and were assumed by Saxon when it acquired Standard in 1970. The 5¾% Debentures were never traded in the United States; they were issued and traded in Europe.

**7.** Class plaintiff's estimate.

**8.** Objectors' estimate. Class plaintiff's estimate $190–$290.

**9.** The period between the petition in bankruptcy and the plan for reorganization—April 15, 1982 to January 25, 1985—was about two years eight months. While it is true, therefore, that some PPDP's held for longer than two years, it is also true that many held for a much shorter period.

experience, purchased two precise things, putting it in the context of this proceeding. One is the right to claim, the right to claim in bankruptcy, and the second is the right to the proceeds of the class action claim if and when they should be derived.

Transcript of the hearing of September 20, 1985 ("Tr.") at 20.

Objectors begin with the proposition that judgments are assignable—a proposition with which no one argues. From that they argue that the PPDP's formed an intent to purchase the rights to some future judgment, and therefore there was an implied assignment of those rights.

This argument has little merit. Even if we assume that the PPDP's could reasonably form some intent to purchase the rights to recover a future judgment there is no indication that the sellers intended to sell such rights. Mr. Walsh may not use his personal subjective intent to infer that the sellers had an intent to transfer their rights. Absent a showing that there was an intent to transfer the rights on the part of both the purchaser and seller the PPDP's argument must fail.

### Did the Market Reaction Support the PPDP's Transfer Theory?

Plaintiffs correctly assert that the market's reaction should reflect whether a transfer of rights occurred. Had there been some general expectation that holders of bonds purchased from class members would receive some share of any class action proceeds, the market would have differentiated between debentures purchased from class members and those purchased from pre-fraud holders.[10] Presumably the market would reflect the added value which class member's debentures carried.

When the alleged frauds were disclosed in 1982 the market re-valued the bonds based on the new, accurate, information. The value of the bonds—including the bonds purchased before 1976—plummeted. The record shows that the market assigned the same value to all debentures, regardless of whether they were purchased from pre or post-fraud holders.

### Does Federal Law Dictate Automatic Assignment of Rights?

The PPDP's next argue that federal law dictates a rule of automatic assignment of rights. They begin their argument by pointing out that the purchaser of a bond automatically receives the right to collect the full face value of the bond even if it was purchased at a substantial discount; *In re Lorraine Castle Apartments Bldg. Corp.*, 149 F.2d 55, 57–58 (7th Cir.), *cert. denied*, 326 U.S. 728, 66 S.Ct. 35, 90 L.Ed. 432 (1945); *In re W.T. Grant*, 4 B.R. 53, 77 (S.D.N.Y.1980). While the point is undoubtedly true, it again does nothing to advance the PPDP's argument. Those cases simply state that a purchaser receives the full *contract* right to collect the face amount of the bond. That is precisely what the PPDP's received—the contract right to receive the $1000 face falue of the bond. That the full amount was never collected due to the Saxon's bankruptcy is wholly irrelevant. The PPDP's received their contract rights as determined in the bankruptcy proceeding. *Lorraine Castle* and *W.T. Grant* have no relevance beyond the context of contractual rights.

The PPDP's argument then turns to cases such as *Mills v. Sarjem Corp.*, 133 F.Supp. 753 (D.N.J.1955) and *International Ladies' Garment Workers Union v.*

---

**10.** It is important to note that those who purchased debentures prior to March of 1976 have no claim of fraud. The alleged fraud is *fraud in the inducement to purchase.* It is not claimed that sometime after class plaintiffs purchased, the defendants fraudulently diminished the underling intrinsic value of Saxon. Rather, the class plaintiffs claim that prior to their purchase of the debentures the defendants fraudulently misrepresented the value of Saxon thus inducing them to purchase its securities. The class members, who purchased at the allegedly artificially inflated prices between 1976 and 1982, suffered severe losses, however, the pre-fraud purchasers suffered no real loss. They were not induced to purchase at artificially inflated prices, therefore they cannot establish transaction causation. *See, Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 313–14 (1985); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

*Shields & Co.,* 209 F.Supp. 145 (S.D.N.Y. 1962) which hold that fraud claims in connection with the sale of a debt security do not abate at the death of the plaintiff and are therefore assignable. They go on to argue, based on *Phelan v. Middle States Oil Corp.,* 154 F.2d 978 (2d Cir.1946) and *Lowry v. Baltimore & Ohio R. Co.,* 707 F.2d 721 (3rd Cir.1983), that the assignment should be automatic.

The objectors first premise, that the cause of action is assignable is not an inherently obvious proposition. While tort fraud claims may well be assignable, the gravamen of class plaintiffs' complaint is a violation of Rule 10b–5 and § 10(b) of Exchange Act. It is established beyond question that in order to have standing to bring a 10b–5 claim the plaintiff must be either a purchaser or seller. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Section 10(b) prohibits fraud *"in connection with* the purchase or sale" of a security. 15 U.S.C. § 78j(b) [emphasis added]. That the PPDP's eventually purchased the security does not make them purchasers within the meaning of § 10(b). The term "in connection with" requires that the purchase or sale be in some way connected to the fraud. A 10b–5 plaintiff must demonstrate "both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question." *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *see also, Bennett v. U.S. Trust Co. of N.Y.,* 770 F.2d 308, (2d Cir.1985).

The same conclusion is reached if the question is approached from the requirement of reliance. While specific reliance is not required to bring a 10b–5 claim, *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 *reh. denied,* 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 (1972); *Titan Group, Inc. v. Faggen,* 513 F.2d 234 (2d Cir.1975), some minimal form of reliance is

necessary, *Titan Group; Clegg v. Conk,* 507 F.2d 1351 (10th Cir.1974), even if it is simple reliance on a market tainted by fraud. In the case at bar the PPDP's admit that they did not purchase in reliance on the alleged frauds, rather they purchased after the fraud was disclosed. By that time the market had corrected for the fraud.

Because the PPDP's did not purchase in reliance on the fraud, they would be barred from bringing their own 10b–5 action by the purchaser/seller requirement of *Blue Chip.* The *Blue Chip* rule was intended to limit the availability of 10b–5 actions. *Accord, Rose v. Arkansas Valley Environmental & Utility Auth.,* 562 F.Supp. 1180, 1189 (W.D.Mo.1983). If a 10b–5 claim could be assigned, whether implicitly or otherwise, the purchaser/seller requirement might be effectively abridged. Remote purchasers who were never touched by any fraud would have standing to assert the claims of the defrauded purchaser/seller.

In apparent recognition of this reality counsel for the PPDP's stated "we concede we don't have standing to sue." Tr. at 43; see also Tr. at 25. They argue, however, that if a purchaser/seller with standing brings a 10b–5 action then a subsequent purchaser of that security may demand the proceeds of the action. The objectors' logic is at best strained. If we accepted the PPDP's argument the value of a security would be dependent on whether some prior holder brings, vigorously prosecutes and ultimately wins an action in which he has no possibility of recovering any damages. This Court does not believe that anyone would undertake such a gratuitous prosecution. Moreover, the person with purchaser/seller standing under the *Blue Chip* might, under the PPDP's scenario, give up their concrete interest in the outcome of the litigation and would thereby be divested of standing in the more general sense.

The recent case of *Rose v. Arkansas Valley Environmental & Utility Authori-*

*ty,* 562 F.Supp. 1180 (W.D.Mo.1983) strongly supports the non-assignability of 10b–5 rights. In that case Judge Roberts said "[s]ince plaintiffs ... are ... clearly neither 'sellers' nor 'purchasers' of those bonds, perhaps nothing more needs to be said." 562 F.Supp. at 1188.

While a good argument may be made that 10b–5 rights are not generally transferrable while mere choses in action, we recognize that under certain limited circumstances it is appropriate for someone other than the purchaser or seller to assert the rights. The remedial aspect of 10b–5 dictates that the action should not abate at the death of the purchaser/seller. See *Mills v. Sarjem Corp.,* 133 F.Supp. 753 (D.N.J.1955). In other cases the 10b–5 rights may be asserted by someone in privity with the purchaser/seller, however, absent such a special relationship only the purchaser/seller may assert such rights.[11] *But see Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 450 F.Supp. 639 (S.D.N.Y.1978) (widow of purchaser lacks standing to assert 10b–5 claim); *Lincoln Nat. Bank v. Lampe,* 414 F.Supp. 1270 (N.D.Ill.1976). Accordingly we believe that 10b–5 claims may not be assigna-

ble except in limited circumstances.[12] Because no assignment took place on the facts of this case, it is not necessary to reach a holding on the general assignability of 10b–5 actions.

Even if we accept the objectors' premise, *viz* that a 10b–5 claim is assignable, we reject their argument that the assignment is automatic. The clear weight of case law—most of it directly on point—indicates that there is no automatic assignment of rights. See *Rose v. Arkansas Valley Environmental & Utility Authority,* 562 F.Supp. 1180, 1189 (W.D.Mo.1983) ("[T]he cause of action itself is entirely separate and distinct from the security which gave rise to it, and does *not* automatically follow the ownership of that security." [emphasis in original]); *Independent Investor Protective League v. Saunders,* 64 F.R.D. 564 (E.D.Pa.1974) ("While a security is of course transferred by its sale, the cause of action belonging to a prior holder does not pass with the transfer of the security."); *International Ladies' Garment Workers Union v. Shields & Co.,* 209 F.Supp. 145 (S.D.N.Y.1962).

In *ILGWU* Judge Dimock aptly noted:

**11.** In all of the cases where 10b–5 rights may be asserted by one other than the purchaser/seller, the relationship of privity seems to be created by operation of law (i.e. the bankruptcy court places the trustee in the shoes of the Debtor Under the Act). *Cf. Phelan v. Middle States Oil Corp.,* 154 F.2d 978 (2d Cir.1946).

**12.** The cases cited by the PPDP's are inapposite. *Mills v. Sarjem Corp.,* 133 F.Supp. 753 (D.N.J. 1955) and *Derdiarian v. Futterman Corp.,* 223 F.Supp. 265 (S.D.N.Y.1963) both deal with the right of a decedent's estate to maintain an action and do not support general assignability. *International Ladies' Garment Workers Union v. Shields & Co.,* 209 F.Supp. 145 (S.D.N.Y.1962) is somewhat more problematic. While the factual development in that case is not clear, it appears that *ILGWU,* simply incorporates the *Mills* holding. Moreover, the *ILGWU* case was decided thirteen years prior to the Supreme Court's landmark decision in *Blue Chip.* (It was however decided after lower courts held that 10b–5 actions could only be maintained by purchasers or sellers. See e.g. *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.) *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).) We recognize that some of what was said in the five-opinion plurality (actually a per curiam de-

cision) in *Lowry v. Baltimore & Ohio R. Co.,* 707 F.2d 721 (3rd Cir.1983) supports the free assignability of 10b–5 actions. We note especially Judge Gibbons comments in dissent in which he specifically opines that 10b–5 claims are assignable. 707 F.2d at 739 (Gibbons, J. dissenting). In support of his opinion he cites *Western Auto Supply Co. v. Gamble-Skogmo, Inc.,* 348 F.2d 736, 739–41 (8th Cir.1965), as well as the *ILGWU* and *Mills* cases. As noted before the *Mills* case supports the proposition that 10b–5 actions are not generally assignable and we believe that the *ILGWU* case is inapposite. *Western Auto* was a case decided under § 16(a) of the Exchange Act, 15 U.S.C. § 78p(a), and simply held that a corporation's right of action against its insiders for so-called short-swing profit may be prosecuted by a successor corporation. Section 16(a), of course, has no purchaser/seller requirement like § 10(b)—in fact by definition it could not— and therefore does not advance the argument. While of course mindful of the difficulties in reaching a single opinion in an *en banc* court, we find the *Lowry* opinions of little help to us. The five opinions reach a clear holding on no single issue.

Of course by a mere assignment of securities the assignee does not acquire any and all rights of action that the assignor may have had against the person from whom he bought. One who has been defrauded by the sale of goods to him of a value less than they would have had if as represented retains the right of action for the amount of his damage unaffected by his parting with the goods.

209 F.Supp. at 149.

In a recent decision, almost directly on point, the Ninth Circuit unanimously held that there was no automatic assignment of rights. The Court stated:

A cause of action arising from reliance on misrepresentation is personal to those persons who relied; it does not follow the security to remote purchasers who had no basis for reliance. Thus, the Phelps Committee purchasers, who acquired their securities after Nucorp's public disclosure, were not automatically assigned the class members' federal causes of action when they made their purchases. If we held otherwise, we would remove the remedy from those to whom the statute provides it, *i.e.*, those who were defrauded, by gratuitously giving it to those who were not defrauded and have suffered no injury under the securities law.

*In Re Nucorp Energy Securities Litigation*, 772 F.2d 1486, 1490 (9th Cir.1985) (citations omitted).

In the face of this clear authority to the contrary, the PPDP's argue that the case law dictates that 10b–5 rights are automatically assigned by the transfer of the underlying security. In support of their argument they cite two cases: *Phelan v. Middle States Oil Corp.*, 154 F.2d 978 (2d Cir.1946) and *Lowry v. Baltimore & Ohio R. Co.*, 707 F.2d 721 (3rd Cir.1983).

The *Phelan* case arose out of the reorganization of a group of related companies. The bonds at issue were those of United, one of the bankrupt's subsidiaries, but were secured by the stock of Eureka, a wholly-owned subsidiary of United. Under the receiver's plan of reorganization, bond-holders could either deposit their bonds in exchange for securities of a new company or redeem their bonds for a *pro rata* share of the bankrupt estate. Part of United's assets were the proceeds from the sale of the Eureka stock—which had collateralized the bonds. The Eureka stock had been purchased at a judicial sale by the reorganization committee headed by the receiver himself.

After the time for deposit expired, plaintiff's husband purchased some of the undeposited bonds. He presented them for payment, and received a liquidating distribution of 68 cents on the dollar. After his death, when the receiver proposed to wind up the bankrupt estate, his widow, as executrix, charged the receiver with fraud and sought an accounting and to surcharge the receiver. She claimed that her husband's estate should have received more than 68 cents on the dollar for his bonds. She charged that Eureka had been purchased by the reorganization committee at a fraudulently low price.

The Second Circuit held that the widow could demand that the receiver be surcharged despite the fact that her husband did not own the bonds at the time of the alleged fraud. The PPDP's argue that by analogy they should be allowed to recover under 10b–5 even though they did not hold the bonds at the time of the alleged frauds.

It is not clear that *Phelan* is applicable to this case. To apply *Phelan* to a 10b–5 action is to rip it from its contextual roots: *Phelan* is a bankruptcy case. Any objective reading of *Phelan* discloses the Second Circuit's obvious concern with protecting the integrity of a *federal* receiver. As the Circuit stated:

The doctrine, relative to receivers, of strict accountability, and of opposition to divided loyalties, is prophylatic; it aims not merely to punish actual evil in cases where it occurs but to avoid the "tendency to evil in other cases."

154 F.2d at 1001 [citations omitted].

Moreover *Phelan* was decided in 1946, 25 years before the Supreme Court first im-

plied a civil remedy under Rule 10b–5, *Superintendent of Insurance of New York v. Bankers Life and Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971),[13] and almost thirty (30) years before *Blue Chip.*

*Phelan* is also distinguishable from the case at bar. The alleged fraud in *Phelan* diminished the value underlying the bonds, whereas the fraud in the instant case was fraudulent inducement to purchase the bonds. The wrong in *Phelan* impaired the obligor's ability to pay the bonds according to their contract terms. Unlike the plaintiff in *Phelan,* the PPDP's cannot claim that but for the alleged fraud they would have received a higher return when they cashed their bonds in bankruptcy.

This distinction between a fraud which impairs the contract obligation to pay the bond, and a fraud which wrongfully induces one to purchase the bond, makes *Phelan* inapplicable to the case at bar. The transferee in *Phelan* actually suffered an injury. The PPDP's acquired their bonds at a fraction of their pre-petition price after public disclosure of the alleged frauds. The *Phelan* court's holding clearly rests on the assumption that the purchasers bought without knowledge of the fraud. As the Second Circuit, in discussing the shortcomings of the New York law as it existed at that time stated:

> The seller of such bonds—*ex hypothesis* unaware, at the time of the sale, of the wrong done by the trustee—in actual fact can have no notion of retaining any cause of action against the trustee; and the seller of a bearer bond is exceedingly hard to trace. The practical consequence

of the New York rule therefore is that most of the claims against a trustee for wrong done ... will never be prosecuted ...

154 F.2d at 1001. Thus *Phelan* is distinguishable.

The objectors also attempt to find support for their position in *Lowry v. Baltimore & Ohio R. Co.*, 707 F.2d 721 (3rd Cir.1983) (in banc) (per curiam). In that case eight Judges of the Third Circuit heard the case in banc. At best only three of the eight judges who participated [14] embraced the PPDP's argument. At least as many judges explicitly rejected the automatic assignment argument. The remaining judges did not reach the issue.

Regrettably the *Lowry* decision is of no help to us. The five-opinion decision reaches no clear holding. Neither plaintiffs or objectors can derive any support from the case.[15]

For all of the above reasons we concluded that even if 10b–5 actions are assignable, there is no automatic assignment of rights under federal law.

*Is New York Law Applicable?*

The Objectors also argue that automatic assignment is supported by New York law. Both parties agree that federal law, not state law, governs the question of assignability of federal securities claims. (Defendant's Memorandum in support of the PPDP's Objections at 15, unnumbered footnote; Plaintiffs' Memorandum in Opposition to PPDP's Objections at 7, and the authority cited therein); *In Re Nucorp Se-*

---

**13.** The first reported case to consider the question of implied civil suits under Rule 10b–5 was *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). The first occasion the Second Circuit considered the question appears to be *Fischman v. Raytheon Manufacturing Co.,* 188 F.2d 783 (2d Cir.1951).

**14.** Two Judges on the Third Circuit did not participate in consideration of the case.

**15.** The PPDP's argue that we should accept the three dissenting judges logic. Even if the dissent were controlling here, it is distinguishable. *Lowry* involved no claim of fraudulent inducement to purchase the security. In *Lowry* the

plaintiffs were effectively defrauded in their rights to convert their bonds to equity stock, which in turn impaired the *contract* rights in the bond. Plaintiffs in *Lowry* alleged that defendants had declared a substantial stock dividend in favor of its common shareholders without giving notice to the convertable debenture holders who were thereby deprived of the opportunity to convert their debentures and share in the dividend. The right to convert was a *contract* right granted in the debenture. *Lowry* was not a fraudulent inducement to purchase case and is therefore wholly inapplicable to the case at bar.

*curities Litigation,* 772 F.2d 1486 (9th Cir. 1985). In light of the fact that state law does not apply, it is somewhat curious that there should be argument as at its contours. The state law simply does not apply.[16]

*Does the Policy of the Federal Securities Laws Dictate A Rule of Automatic Assignment?*

Finally, the PPDP's argue that the policy of the federal securities law dictates a rule of automatic assignment. We cannot agree.

They contend that without automatic assignment the market for bonds which are tainted by fraud would dry-up. The PPDP's argue that without automatic assignment the holders of such bonds would be deprived "of a most valuable option, the ability to sell the security immediately and recover the amount at which the market then values the fraud claim." (Objectors' brief at 18.)

This argument is belied by the fact, previously noted, that the market did not differentiate between bonds which were and were not tainted by the fraud. The market reflected no added value for the bonds which might have fraud claims, because it quite correctly assumed that the rights of action under 10b–5 remained with the purchaser/seller who was defrauded.

Finally we note that if we accepted the Objectors' argument, we would reach the absurd conclusion that no seller of securities the price of which was depressed by a fraud, would be protected by § 10(b). As discussed earlier, Rule 10b–5 provides a cause of action for purchasers *and* sellers in reliance on a fraud. If 10b–5 rights were automatically assigned to subsequent holders then by definition a defrauded seller[17] would have transferred his rights by selling in reliance on the fraud. The seller's cause of action would simultaneously accrue and be transferred out of his hands. In fact in some cases the buyer, who would receive the rights, would also be the person perpetrating the fraud. For example an insider who fraudulently depresses the value of his corporation's security through incomplete disclosure, would purchase the security at the depressed price and then be immune to a 10b–5 action because he would also hold the rights to the recovery. *See e.g., S.E.C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) (in banc) *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The same result would occur in a tender offer where the price was depressed by the fraud.[18]

**16.** First the PPDP's claim that New York General Obligations Law ("GOL") § 13–107 (McKinney 1978) supports automatic assignment. Plaintiffs' correctly point out that statute on its face is limited to action "on the bonds" or "under any Indenture" against the "Obligor," "Trustee" or "Guarantor." The defendants in the instant cases are not Obligors, Trustees or Guarantors and 10b–5 actions do not fall within the ambit of the contract notion of "on the bond" or "under any Indenture." The statute is inapplicable to claims such as are asserted in this case, and has no relevance to actions against outside parties such as directors and accountants (i.e. Fox). Moreover the legislative history of GOL § 13–107 clearly indicates that the statute does not apply. *See,* New York Law Revision Commission Report, 1950, at 67–94.

The second statute which the PPDP's attempt to apply is New York Uniform Commercial Code § 8–301. They argue that the language in that section which states, "Upon transfer of a security to a purchaser ... The purchaser acquires the rights in the security which his transferor had or had actual authority to convey ..." dictates automatic assignment of 10b–5 claims. Section 8–301 by its terms deals with the rights "in the security." It applies to the contract rights in the security and cannot be read to have any relevance to claims of fraudulent inducement to purchase.

As discussed earlier, federal law dictates the rule of law to be applied to federal rights. The state statutes have no applicability, however, even if they were applied to the instant case, they would not support the PPDP's objection.

**17.** Of course if the fraud had the effect of inflating the market price then the seller would have no damages, and thus would not be "defrauded".

**18.** Likewise the innocent open market purchaser of a security (the price of which was fraudulently depressed) might reap the benefit of the fraud twice. After the fraud was disclosed the purchaser could receive the defrauded seller's recovery via "automatic assignment." Moreover, because the price would rise in response to disclosure the purchaser could sell the securi-

While, of course, the case at bar is a defrauded purchaser not seller case, we can see no justification for applying a different rule to purchasers than sellers. Rule 10b–5 was intended to protect purchasers and sellers. The objectors' argument is wholly contrary to that intent.

The policy of federal securities law is to compensate those who suffered losses because of fraud and manipulation. The PPDP's cannot claim that they were defrauded: They purchased the bonds with their eyes wide open. Nor can they claim to have lost money in the transaction: They profited. The people who the law was intended to protect are those who were defrauded. The members of the class sustained substantial loss due to the alleged fraud and the proceeds from the settlement of this action belong to them.[19]

## CONCLUSION

The claims of the post-petition debenture purchasers must be rejected. There was no assignment of rights. The plan for distribution of the settlement proceeds is approved as submitted.[20]

It Is So Ordered.

---

ty for a profit at the un-depressed price. Meanwhile, the defrauded seller would receive nothing.

**19.** We also believe that Walsh and Weber are guilty of laches. They, as sophisticated investors, monitored this litigation, however it was not until after a substantial settlement had been reached that they sought to protect their "interest." If they believed that they had a valid claim they should have offered, to class plaintiffs' lead counsel, to accept some of the burden of prosecution. In fact, it appears that Walsh rejected invitations to participate in the settlement negotiations.

While we believe that Walsh and Weber are guilty of laches, we do not rely on this holding since it may unfairly prejudice other PPDP's who were less sophisticated in investment matters.

**20.** Also pending before the Court are class counsels' petitions for fees and costs. The Global settlement specifically provides that fees should not be paid until the judgments of this Court are final and no longer appealable. Pending that event the petitions for fees will be held in abeyance. However since the law firms involved well earned their fees, the fee award, when made, will be retroactive to the date of the settlement hearing and will earn interest at the same rate as the balance of the settlement fund. To paraphrase Judge Learned Hand: money later is not money now—the difference is interest.