Georgina **SODERBERG**, Plaintiff,

v.

Timothy H. **GENS, Acquitech Corporation, an Illinois corporation, Madison Professional Group, Ltd., an Illinois corporation, Winburn & Gray, Ltd., a professional corporation, and John Does One Through Ten, Defendants.**

No. 84 C 10120.

United States District Court,
N.D. Illinois, E.D.

Jan. 28, 1987.

---

Loren J. Mallon, Audrey Holzer Rubin, Gottlieb & Schwartz, Chicago, Ill., for Soderberg.

Daniel C. Meenan, Jr., David A. Axelrod, Feiwell, Galper, Lasky & Berger, Ltd., Chicago, Ill., for Gens, Acquitech and Madison.

John F. Horvath, Dennis J. Powers, Conklin & Adler, Ltd., Chicago, Ill., for Winburn & Gray.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff, the current holder of securities purchased by an insurance company founded by her late husband, brings this action for securities fraud against the corporations who issued the securities, the lawyer who was instrumental in recommending their purchase and the patent law firm which formerly employed that lawyer. She seeks rescission and return of the insurance company's investment. Defendants have moved for summary judgment contending that she lacks standing to sue under the federal securities laws. The law firm additionally contends that it cannot be liable since the lawyer was not acting within the scope of his employment when he gave investment advice. Because plaintiff stood at too great a distance from the purchase, and because the right to sue for rescission of a securities transaction is almost certainly not assignable and in any case was not effectively assigned here, defendants' motions are granted.

## FACTS

John Soderberg was the controlling shareholder of Copco Corp., which in turn owned 100% of Constitutional Casualty Co. ("Constitutional"), an Illinois insurance company. When he died in August, 1982, his shares passed to a trust. His widow,

Georgina Soderberg, plaintiff here, and his daughters, Janet Soderberg Ventre and Christine Soderberg Solomon, are both the beneficiaries and the co-trustees of that trust. Janet, who had just graduated from law school two months before her father died, also became executive vice president of both Copco and Constitutional following her father's death.

Constitutional began experiencing legal and financial difficulties shortly thereafter. Minority shareholders sued the corporation, the estate and the Soderbergs individually. The company ceased showing a profit. In April or May 1983, Janet met defendant Timothy Gens while playing volleyball at the Latin School on Monday nights, and rapidly became romantically involved with him. Gens, a patent lawyer then with defendant Winburn & Gray, claimed to have experience with Illinois law governing insurance companies from work for a previous employer. He also claimed investment knowledge. By July 1983, on Janet's recommendation, Constitutional had hired Gens as a management consultant at $2,000 per month, apparently without his employer's knowledge. Gens retained that function even after the romantic aspect of his relationship with Janet ended in late 1983 and Janet married someone else.

According to Janet's deposition, Gens developed an investment strategy for Constitutional intended to improve Constitutional's income from investments. Following Gens' advice, the company acquired six new assets, including the securities in question here. Defendant Acquitech Corporation and defendant Madison Professional Group appear to have been set up expressly for Constitutional, which paid for their incorporation. Gens allegedly assured Janet that the investment strategy would not place Constitutional in any jeopardy regarding state regulation of insurance company investments. Constitutional purchased the Acquitech stock in December, 1983 and the Madison stock in March, 1984. However, in April 1984 the Illinois Department of Insurance found the investments "inadmissible". Constitutional's capital was deemed impaired and it had to raise an additional $300,000. Despite this surprise, Constitutional continued to accept and cash dividend checks from Acquitech and Madison through October, 1984.

The Acquitech and Madison stock came into Georgina's hands when the Soderbergs and the minority shareholders sold Copco and Constitutional on June 13th, 1984. The buyer did not want the six assets which Constitutional had purchased on Gens' recommendation. He agreed to purchase the company only if the Copco shareholders would in turn buy those assets back from the company. By the terms of the sale agreement, the minority shareholders received all of the cash which actually changed hands at that time. Some $365,000 of the proceeds from the sale of the Copco stock, including the Soderbergs' entire share of the purchase price, went immediately back to Constitutional to pay for the six assets which the buyer did not want. At the same time, Constitutional executed a formal assignment of "all claims, causes of action, and rights arising out of the negotiation, purchase, acquisition or retention" of five of these assets to Georgina Soderberg, the securities which are the subject matter of this suit among them. The securities were registered in Georgina's name. According to Janet's deposition testimony, the disputes over three of those assets have been settled for approximately $195,000. However, there was no agreement about Acquitech and Madison.

For the first three or four months after the sale, Constitutional apparently forwarded the dividend payments from Acquitech and Madison to Georgina. Georgina announced her intent to rescind the Acquitech and Madison transactions on September 26th, 1984. Since then, dividend checks have been refused. This suit, alleging fraud in the sale of the two remaining securities, was filed in November, 1984. The nine-count complaint seeks rescission of the purchase transaction from Gens, Acquitech and Madison under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); § 12(2) of the Securities Act of

1933, 15 U.S.C. § 77*l* (2); § 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6; 15 U.S.C. §§ 77q and 78t; two Illinois statutes, and common law fraud. A count also seeks rescissionary damages from Winburn & Gray. Plaintiff has neither tendered, nor offered to tender, the amount of the dividends paid before she demanded rescission.

## DISCUSSION

Since all of the parties to this action are citizens of Illinois, this Court only has jurisdiction if plaintiff's complaint presents a federal question. Defendants point out that to have standing under each of the federal statutes in question, one must be the purchaser (or, in some cases, seller) in the allegedly fraudulent securities transaction, *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 734, 95 S.Ct. 1917, 1923, 1924, 44 L.Ed.2d 539 (1975), with the exception of § 206, which is limited to a client of an allegedly dishonest investment adviser. *Reserve Management Corp. v. Anchor Daily Income Fund, Inc.*, 459 F.Supp. 597, 608 (S.D.N.Y. 1978). The purchaser or client here, they contend, is Constitutional, which is not a party to this suit.

■ At the time the alleged fraud occurred, Georgina was merely a beneficiary of a testamentàry trust which held stock in Copco, which in turn held the stock of Constitutional. If her trustees had purchased the Acquitech or Madison stock directly for the trust on her behalf, we might well be able to look through the apparent barrier presented by the trust and grant Georgina standing as one who experienced the direct impact of the transaction. *See Norris v. Wirtz*, 719 F.2d 256, 259 (7th Cir.1983), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 185 (1984); *Kirshner v. United States*, 603 F.2d 234, 240 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979); *Heyman v. Heyman*, 356 F.Supp. 958, 965 (S.D.N.Y. 1973). However, it is settled law that status as a shareholder in a corporation victimized by securities fraud does not of it-

self give an individual standing to sue under federal securities laws. Any impairment of value of shares of stock by a corporation's investment transactions is at bottom a question of corporate mismanagement as far as shareholders are concerned, and "Congress ... did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). *See Simmons v. Wolfson*, 428 F.2d 455 (6th Cir.1970), *cert. denied*, 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed.2d 450 (1971); *Vanderboom v. Sexton*, 422 F.2d 1233 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970); *Ross v. Longchamps, Inc.*, 336 F.Supp. 434 (E.D.Mo.1971). The corporation, as the actual purchaser, has the securities fraud claim, although in appropriate circumstances a shareholder can bring a derivative suit on the corporation's behalf. *Ohashi v. Verit Industries*, 536 F.2d 849 (9th Cir.1976), *cert. denied*, 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976); *Surowitz v. Hilton Hotels Corp.*, 342 F.2d 596 (7th Cir.1965), *rev'd on other grounds*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966); *Guttman v. Brinkmann*, 410 F.Supp. 46 (W.D.Pa.1976). Georgina, however, no longer has an interest in the insurance company and does not pursue a derivative action. The question for purposes of this suit, then, is whether her additional statuses, either as current holder of the securities or as assignee of any right of action Constitutional had, take her sufficiently outside the general rule to give her the standing she otherwise lacks.

■ Holder status does not. Recent case law interpreting § 10(b) is virtually unanimous in concluding that the federal cause of action does not attach automatically to the security itself and pass to the next purchaser. *In re Nucorp Energy Securities Litigation*, 772 F.2d 1486, 1490 (9th Cir.1985); *In re Saxon Securities Litigation*, 644 F.Supp. 465, 471 (S.D.N.Y. 1985); *Rose v. Arkansas Valley Environmental & Utility Authority*, 562 F.Supp. 1180,

1189 (W.D.Mo.1983); *Independent Investor Protective League v. Saunders*, 64 F.R.D. 564, 572 (E.D.Pa.1974). *Contra Lowry v. Baltimore & Ohio R.R.*, 707 F.2d 721, 739 (3d Cir.) (Gibbons, J., dissenting), *cert. denied*, 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983); *id.*, 707 F.2d at 746 (Seitz, J., dissenting). The result stems not only from the statutory emphasis on "purchase" but from policy considerations. Ordinarily the injury remains with the first purchaser who was actually the victim of the fraud. If he has managed to sell the securities, in most cases they will have sold for far less than he paid for them precisely because of the fraud. If he is to be compensated for his loss, the right of action should ordinarily remain with him as well. *Lowry*, 707 F.2d at 729 (Garth, J., concurring); *id.* at 732 (Adams, J., concurring); *Saunders*, 64 F.R.D. at 572. Being the holder of a security thus does not of itself confer standing under § 10(b) if the plaintiff does not otherwise have standing.

■ The question has apparently not arisen with respect to § 12(2) or § 206 claims. However, § 12(2), which covers prospectus fraud, expressly states that a defendant's liability runs "to the person purchasing such security from him." Thus, courts construing this statute have described it, for example, as creating an action "for a purchaser to claim against his immediate seller." *Collins v. Signetics Corp.*, 605 F.2d 110, 113 (3rd Cir.1979); *see, e.g., Lanza v. Drexel & Co.*, 479 F.2d 1277, 1298–1299 (2d Cir.1973); *Klein v. Computer Devices, Inc.*, 602 F.Supp. 837, 840–841 (S.D.N.Y. 1985); *In re Fortune Systems Securities Litigation*, 604 F.Supp. 150, 158–164 (N.D.Cal.1984). *See generally* Annot., 56 A.L.R. Fed. 659 (1982). Similarly, the courts which have construed § 206, noting its persistent use of the word "client," read it as limited to persons actually in an adviser/client relationship. *Reserve*, 459 F.Supp. at 608; *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1095 (S.D.N.Y. 1977), *aff'd mem.*, 636 F.2d 1201 (2d Cir.1980); *Kusner v. First Pennsylvania Corp.*, 395 F.Supp. 276, 284 (E.D.Pa. 1975), *rev'd in part on other grounds*, 531 F.2d 1234 (3d Cir.1976); *see also Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979) (statute was "intended to benefit the clients of investment advisers"). It follows that a holder who did not purchase the security from the perpetrator of the fraud and was never a client of the dishonest adviser has no standing under either statute.

■ If there was fraud in these transactions, of course, plaintiff suffered financially from it. However, her loss in that respect is indistinguishable conceptually from the losses of shareholders of a victimized corporation. Courts have held time and again that such losses are not the kind of losses for which the federal statutes provide a remedy. *See, e.g., Bankers Life*, 404 U.S. at 12, 92 S.Ct. at 168; *Norris*, 719 F.2d at 259; *Ohashi*, 536 F.2d at 852. Taking plaintiff's allegations as true, the value of her interest in Copco was diminished because Constitutional had been defrauded. The price of that diminished value was that she became the holder of the securities— they were the assets which Copco's buyer did not want. Simply because her loss took the form of possession of the questionable securities rather than the more usual monetary loss does not change the fact that she suffered the loss as the beneficiary of a trust which held an interest in the victimized corporation, not as a victim herself. Whatever remedy the law may give her personally for that loss, the remedy does not arise under federal securities laws. *Cf. In re Penn Central Securities Litigation*, 62 F.R.D. 181, 185 (E.D.Pa.1974) (federal securities laws "do not protect all who may have sustained a loss as a result of deceptive practices.")

If plaintiff is to have standing, then, it could come only because Constitutional expressly assigned its right of action to her. The parties argue over the proper interpretation of the few cases which have dealt with the question of whether a § 10(b) action for damages is assignable. The parties have not cited, and this court is not

aware of, any case which has considered assignment of a § 12(2) or § 206 claim. *Saxon,* the most recent case to deal with the problem in the § 10(b) context, did not have to reach the question since its facts did not include an express assignment. The court nevertheless commented that the Supreme Court's emphasis on purchaser/seller standing in *Blue Chip* probably made § 10(b) damage claims assignable, if at all, only under very limited circumstances. *Saxon,* 644 F.Supp. at 470–471. Plaintiff points to *International Ladies' Garment Workers' Union v. Shields & Co.,* 209 F.Supp. 145, 149 (S.D.N.Y. 1962), and *Mills v. Sarjem Corp.,* 133 F.Supp. 753, 761 (D.N.J.1955), as supporting the assignability of such actions. Defendants counter that both decisions came well before *Blue Chip* and, moreover, that the comments in *Mills* are dicta, since that case dealt with survival of a § 10(b) action, not assignment. Three judges of the Third Circuit indicated in *Lowry* that they would have upheld an express assignment of the cause of action had it been present on their facts, since under rare circumstances the original purchaser might have been able to pass part of the loss on to a subsequent purchaser. 707 F.2d at 729 (Garth, J., concurring); 707 F.2d at 732 (Adams, J., concurring). However, since there was no express assignment in *Lowry,* these statements are dicta as well.

■ Actually, none of these cases are on point, since plaintiff here seeks rescission of the purchase, not damages. Rescission and damages are normally mutually exclusive remedies. Rescission rests on a disaffirmance of the transaction and return to the status which existed before the transaction was made. For damages, one accepts the contract but sues for the loss caused by the fraud. The Supreme Court noted just last term that thanks to the express limitation to "actual damages" in 15 U.S.C. § 78bb(a), one cannot even be certain that rescission is an available remedy in § 10(b) actions. *Randall v. Loftsgaarden,* 478 U.S. ——, ——, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986). Even if it is, the question of whether a right to rescission under

federal securities laws can be effectively assigned differs markedly from the question of assignment of a right to damages. Because of the equitable and personal character of the right to sue for rescission, claims for rescission are ordinarily not assignable. 6A C.J.S. *Assignments* § 35 (1975); 6 Am.Jur.2d *Assignments* § 31 (1963). We have no reason to think that federal securities fraud actions should be an exception to that general rule.

■ Conceptually, it is difficult to see how a right to rescission of a securities transaction could be effectively assigned. A party loses a right to rescission of a fraudulent transaction by taking any action inconsistent with disaffirmance of the transaction after learning of the fraud, such as acceptance of benefits under the contract or exercise of dominion over the subject matter of the transaction. *See, e.g., Gannett Co., Inc. v. Register Publishing Co.,* 428 F.Supp. 818, 824, 826 (D.Conn. 1977) (securities); 3 Restatement (2d) of the Law of Contracts, § 380(2) and comment b (1981). A plaintiff seeking rescission also must tender, or at least offer to tender, the subject matter of the contract. There are only two possibilities for an assignment of a right to rescind: either the purchaser would transfer both the security and the action for rescission to the third party, or the purchaser would transfer only the right of action. The purchaser cannot sell the security without exercising dominion over it, which ordinarily extinguishes any right to rescission. Thus a purchaser who attempts to transfer both the security and the action would seem to have no right of rescission to transfer. If, on the other hand, the purchaser keeps the security but assigns the right of action, the assignee/plaintiff has no power to tender the subject matter of the contract.

■ It seems likely, therefore, that the reason the parties have not found cases on the assignment of claims under §§ 12(2) and 206 is because the claims cannot be assigned. These sections offer only rescission as a remedy. *Randall,* 478 U.S. at

——, 106 S.Ct. at 3149; *Transamerica,* 444 U.S. at 19, 100 S.Ct. at 246.[1] The statutory language and public policy considerations preserve a right of action for the victim of the fraud if that person is able to dispose of the security. *Cf. Randall,* 478 U.S. at ——, 106 S.Ct. at 3149. However, not only the statutory language, but also the existing case law, emphasize that the actions are personal to the purchaser or client. *See, e.g., Collins,* 605 F.2d at 113; *Reserve,* 459 F.Supp. at 608; *Gross,* 431 F.Supp. at 1095. Personal actions ordinarily are not assignable. Presumably, if rescission is an option under § 10(b), the contours of the remedy would follow those for §§ 12(2) and 206. *See Randall,* 478 U.S. at ——, 106 S.Ct. at 3153. In short, the right to sue for rescission under federal securities laws almost certainly cannot be assigned.

■ In any case, there has been no effective assignment of a right to rescind here. Defendants contend strongly that by June, 1984 Constitutional had no claim for rescission to assign. If, as the complaint alleges, the fraud involved here was the representation that the securities were an admissible investment for an Illinois insurance company, then Constitutional knew of the fraud, or at least of the possibility of it, by April when the state agency rejected those investments. It nevertheless continued to accept benefits under the contract, namely the dividend checks, for several months thereafter, conduct more appropriate to affirmance than rescission. We agree. And even if Constitutional still had a right to rescind after the acceptance of the dividend checks, it extinguished that right when it sold both the securities and its lawsuit to Georgina. When Constitutional's conduct included both retention of benefits and exercise of dominion by selling the subject matter of the contract, the only possible legal interpretation of that conduct is that it affirmed the transaction. Thus, whatever rights passed to Georgina with the assignment of Constitutional's claims

to her, a right to rescind was not among them.

As an additional problem, we note that Georgina has neither tendered nor offered to tender the benefits she and Constitutional received under the contract. In an action for rescission, any such benefits must be disgorged. *Spatz v. Borenstein,* 513 F.Supp. 571, 586 (N.D.Ill.1981). Indeed, plaintiff lacks the power to force Constitutional to pay back the benefits it received—another difficulty with assigning a right to rescind—although she could have offered to make up the difference herself. We need not decide whether all securities fraud actions are either assignable or not assignable. On these facts, plaintiff as an assignee does not have standing for the action she chose to bring, an action for rescission.

Since plaintiff does not have an action against Gens, Winburn & Gray cannot be vicariously liable to her for his conduct. We note in passing, however, that this record does not appear to offer the kind of extraordinary factual situation on which a rational trier of fact could find a reasonable belief that giving investment and management advice, for which Constitutional paid him personally, was within the scope of Gens' apparent authority as a patent lawyer. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 566–567, 102 S.Ct. 1935, 1942–1943, 72 L.Ed.2d 330 (1982); 1 Restatement (2d) of the Law of Agency, §§ 257(b), 265(1) (1958). We also note that plaintiff's difficulties with the rescission remedy apply equally to her state law claims. In any case, since plaintiff has no federal claim, we decline to exercise pendent jurisdiction over them.

### CONCLUSION

Defendants' motions for summary judgment are granted.

---

**1.** The rescission remedy actually arises under § 215 for violation of § 206. *See Transamerica,* 444 U.S. at 19–20, 100 S.Ct. at 246–247.